**OVERSEAS DEVELOPMENT DISC CORP., Plaintiff,**

**and**

**Universal Development Corp., Intervening Plaintiff,**

**v.**

**SANGAMO CONSTRUCTION CO., INC., Defendant.**

**UNIVERSAL DEVELOPMENT CORP., Intervening Cross–Plaintiff,**

**v.**

**OVERSEAS DEVELOPMENT DISC CORP., Intervening Cross–Defendant.**

**No. 77–3147.**

United States District Court, C. D. Illinois.

Dec. 3, 1980.

John F. Bomster, Providence, R. I. and Kenneth H. Otten, Springfield, Ill., for Overseas Development Disc Corp.

Gary Green, Philadelphia, Pa. and R. H. Heckenkamp, Springfield, Ill., for Universal Development.

Jerold S. Solovy, Michael J. Rovell, Dorothy B. Zimbrakos, Chicago, Ill. and Robert B. Oxtoby, Springfield, Ill., for Sangamo Construction Co.

## DECISION AND ORDERS

ROBERT D. MORGAN, Chief Judge.

This cause of action is before the court for decision and judgment following a bench trial.

The plaintiff, Overseas Development Disc Corp. (ODC), is a New York corporation having its principal place of business in New York City. It was at all material times engaged in international trade, principally in nations of the Middle East. Its complaint alleges that that engagement included both trading on its own account and its acting as finder or broker in bringing together potential buyers and sellers of goods and services. At all material times, Attila Turkkan was the president and chief executive officer of ODC.

Defendant, Sangamo Construction Co., Inc. (Sangamo), is a Delaware corporation having its principal place of business in Springfield, Illinois. At all material times, Sangamo was engaged principally in the business of constructing roads, bridges, and other highway facilities. At all material times, Alan Reyhan was the president and chief executive officer of Sangamo.

Universal Development Corporation (UDC) intervened as a party to this cause. UDC is incorporated under the laws of the Grand Cayman, British West Indies, and has its principal place of business in the State of New Jersey. Its corporate purpose includes the business of international trade. Since January 1976, Taj Farouki has been a vice president of UDC. To round out the parties' interrelationships, Farouki was a full–time employee of ODC from about August 1974 until October 1975, and he thereafter remained associated with ODC on a project–to–project basis until a time in 1977.

This controversy had its genesis in the stipulated fact that, in 1977, Sangamo was awarded a contract by the government of Kuwait for the construction by it of one part of a major highway construction project known, overall, as the Kuwait Motorway Project.

The pleadings involved some complexity, which was in part lessened by the court's rulings at the close of all of the evidence allowing several motions for directed findings.

ODC filed a complaint against Sangamo in three counts. In Count 1 it alleged that it became aware of the proposed Kuwait Motorway Project in early 1975; that it introduced the project to Sangamo; that an oral contract was made between ODC and Sangamo whereby ODC undertook to render to Sangamo those services which, hopefully, would permit Sangamo to participate in that project; that ODC did render to Sangamo assistance, advice, and services which enabled Sangamo to compete for contracts on the motorway project, and that, as a consequence thereof, Sangamo did obtain a contract in the amount of $60,000,000 for the construction of one phase of that project. ODC prays judgment against Sangamo for a commission under that oral contract in the amount of 1¼ percent of the gross amount of Sangamo's Kuwaiti contract, including any extras which may have enhanced the $60,000,000 value of its contract.

Alternative Count 2 of the complaint rests upon a quantum meruit theory for the recovery by ODC of the reasonable value of its services rendered to Sangamo related to the Kuwait project.

In Count 3 ODC prays a declaratory judgment that it is entitled to receive a commission and finder's fee not only upon the Motorway contract but also upon any other contracts which might be subsequently obtained by Sangamo in Kuwait or elsewhere in the Middle East, as a result of ODC's services in introducing Sangamo to the prospects in the geographic area.

Sangamo answered, denying the material allegations of the complaint. By its affirmative defenses, Sangamo asserted that the claim is barred by the statute of frauds, and averred that any purported agreement between ODC and Sangamo is illegal under Kuwaiti law and thus not enforceable. It also submitted an amended affirmative defense averring illegality of payments.

UDC entered the cause by intervention, with a complaint against Sangamo and a cross–complaint against ODC. Its counts against Sangamo are predicated upon its allegations that there existed a joint venture between Farouki and ODC with re-

spect to the services rendered to Sangamo related to the highway project; that UDC is the assignee of Farouki's rights in that joint venture; and that UDC is entitled to recover from Sangamo compensation for services rendered by that alleged joint venture.

Its counts against ODC are predicated upon its allegations that such a joint venture existed, that Farouki agreed with ODC that ODC would obtain a written contract with Sangamo for the payment to the joint venture of a commission of between 2 and 5 percent of the gross price of the Sangamo construction project, and that ODC negligently failed to obtain such written contract. It prays judgment for damages against ODC in the event that the court should find that no binding obligation of Sangamo existed for the payment of a commission of between 2 and 5 percent of the construction contract price. Its Count 5 prays judgment that UDC, as assignee of Farouki, is entitled to 50 percent participation in any judgment entered for ODC against Sangamo.

Sangamo and ODC denied all material allegations of the intervening complaint and the cross–complaint, respectively.

At the outset of the trial the court ruled that the substantive rights of the respective parties are governed by the law of Kuwait. At the close of the evidentiary record, Sangamo moved for a directed finding in its favor upon each of the three counts of ODC's complaint and upon all counts of UDC's intervening complaint which purported to state a cause of action against Sangamo. ODC moved for a directed finding upon each count of the cross–complaint, and for a directed finding against Sangamo upon each of its defenses.

Responsive to those motions, the court ruled that directed findings would be entered:

a. In favor of Sangamo on Count 3 of ODC's complaint and on Counts 1 through 3, inclusive, of UDC's intervening complaint against Sangamo.

b. In favor of ODC upon Counts 4 and 6, the negligence counts, of UDC's cross–complaint.

c. In favor of ODC, against Sangamo, rejecting the defense based upon the statute of frauds and rejecting the amended defense of illegality.

Judgment will now enter finalizing those rulings.

The critical factual issues presented by the remaining Counts 1 and 2 of the original complaint and the remaining Count 5 of UDC's cross–complaint against ODC can thus be framed. First, was there an oral contract between ODC and Sangamo under which Sangamo agreed to compensate ODC for services extended to Sangamo related to the Motorway project? Second, if there be no proved oral contract, did ODC render to Sangamo services related to that project for which ODC is entitled to compensation under an implied contract or quantum meruit theory? Third, in the event that ODC does recover from Sangamo under either theory, is UDC entitled to a judgment against ODC for its participation in the proceeds of that judgment? Fourth, as a mixed question of law and fact, were the proved activities of ODC and/or Farouki on behalf of Sangamo, related to the project, illegal under the law of Kuwait, with the consequent result that any recovery is barred?

At the outset, the court must dispose of a motion by UDC to, in effect, reopen the evidentiary record to permit it to introduce seven additional exhibits. The evidentiary record, made over a period of four days, was concluded on December 1, 1979. In addition to the reporter's transcript of testimony, it includes more than 150 exhibits introduced by the several parties and the transcripts of six depositions. The pending motion was filed on March 20, 1980.

The thrust of the motion is that the seven exhibits sought to be introduced were identified by trial testimony; that, inadvertently, UDC failed to move their admission in evidence before the evidentiary record was closed; and that counsel first became aware of that omission when a list of exhibits in evidence was received by counsel several

weeks after December 1. It is noted that the motion does not specifically indicate what relevant bearing each of the proposed exhibits would have upon the evidentiary record.

■ The motion is denied. The principle that a trial court is vested with a large discretion in the conduct of trials and in dealing with the order in which evidence will be received, requires no citation of authority. There can be no doubt that that discretion extends to the reopening of a previously–closed evidentiary record in a proper case. However, that discretion to reopen should not be exercised in a situation such as this, which would either preclude an orderly procedure or would require the reconvening of a trial proceeding. Although the court has no reason to doubt the sincerity of counsel's conclusion that no party would be prejudiced by the supplementation of the record with these exhibits, the court, nevertheless, must take the position that the exhibits should not be received absent a context which would afford all parties a full opportunity to record their respective positions with respect thereto.

In addition to the evidentiary record, the several parties have presented for the court's consideration voluminous sets of proposed findings of fact and conclusions of law, as well as memoranda, respectively, espousing each party's view of the evidentiary record. The sheer volume of material evokes the danger of a court inundating itself and counsel under volumes of evidentiary findings.

In briefest summary, the evidence relates to meetings and conversations between the parties in at least two States of the Union and in three foreign countries, a number of telephone conversations, innumerable pieces of correspondence and telex messages exchanged by the parties, and relevant communications of the several parties with persons other than themselves. What follows is a distillation of that total volume of evidence into such findings of fact as are essential to the resolution of this controversy.

## FINDINGS OF FACT

1. In addition to the parties to this cause and the persons hereinafter identified, the following persons and entities who bear upon the factual evidentiary content are identified.

Sangamo Group is a fictitious trade name for a group of related construction companies, including Sangamo; and Sangamo Group (Joint Venture) is a joint venture which was formed by agreement under Illinois law in 1977.

Burhan Kuwaiti Trading and Contracting Company, hereinafter Burhan, is a corporation organized under the laws of Kuwait and having its principal place of business in Kuwait. It is wholly owned by the Al Wazzan family.

Nabil Al Sharif was at all material times the chief engineer of Burhan.

Necati Ackaglilar was at all material times a mutual friend of Reyhan and Turkkan and also the chief executive officer of one member of the Sangamo Joint Venture.

2. From its inception, ODC has engaged in international trade as a representative of business interests in the international market. In 1973 and 1974 it became particularly interested in the oil–rich Middle East as a promising area of economic opportunity. In pursuit of that endeavor, Turkkan, in the summer of 1974, met with Farouki at the latter's then place of business in Chicago, Illinois. Turkkan testified that he sought out Farouki, a Palestinean native, because Farouki had a thorough knowledge of American business practice and of the customs and language of the Arab nations.

3. Farouki was employed by ODC and, in about December 1974, began employment at ODC's New York office as ODC's Mideast regional manager. At about that same time, Farouki was sent by ODC to the Middle East to study and investigate the market potential. He remained in that area for several weeks, during which time he met with diverse Kuwaiti agents and government officials in an effort to locate market opportunities. During that period he was joined temporarily by Turkkan on visits to

the nations of Kuwait, Lebanon, and Saudi Arabia.

4. At a time prior to June 1975, and after his return from the Mideast, Farouki received information that developments of the proposed Kuwait Motorway Project would be soon occurring. Upon receipt of that information, ODC sent Farouki to Kuwait in June 1975, to acquire additional information regarding that prospective development. As a result of that development, ODC began actively seeking contractors who might be interested in the Motorway Project.

5. In May 1975, Turkkan became aware of the existence of Sangamo and Reyhan through a copy of a letter from Ackaglilar to Reyhan which recommended ODC to Reyhan as a consultant on the Middle East.

6. For a number of years prior to 1974, Sangamo had been actively engaged in domestic road building projects connected with the interstate highway program. Beginning in about 1974, such domestic projects became substantially reduced as a consequence of reductions and curtailments in that program. By 1975, Sangamo was actively seeking road building projects outside the United States. Prior to 1975, it had had no experience in the Middle East market. Also, to that time, Sangamo had been involved in only one foreign construction project, namely, a housing project in Haiti, which was contracted as a joint venture with one J. D. Barter Construction Co.

7. In about June 1975, subsequent to the Ackaglilar letter, Reyhan had a telephone conversation with Turkkan, in which Turkkan informed Reyhan generally of construction opportunities in the Middle East. Thereafter, responsive to Reyhan's expression of possible interest, Turkkan phoned Farouki at Chicago in late June and instructed him to arrange to meet with Reyhan to discuss the Middle East opportunities. A meeting was arranged, and Farouki met with Reyhan and other Sangamo personnel at Sangamo's office on July 3, 1975. Farouki had with him at that meeting various documents and notes relating to various projects and opportunities of which he had

become aware during his visits to the Mideast. He described those projects to the Sangamo people. He also advised them that ODC was a marketing organization which represented commercial and construction interests and that ODC was then aggressively pursuing the Mideast markets.

8. After the July 3 meeting, Reyhan wrote to Turkkan saying that he had discussed various projects with Farouki, that he was impressed with Farouki and the market potential, and that he, Reyhan, felt that he should meet with Turkkan to further discuss the matter.

9. Shortly prior to July 17, 1975, Reyhan phoned Farouki expressing a desire to meet again with Farouki to further discuss the Mideast projects. A meeting between Farouki and Reyhan was held at Chicago on July 17, 1975, at which Reyhan brought with him information supporting Sangamo's capacity and qualifications. At that time the parties discussed various Mideast projects, including the Kuwait Motorway Project.

10. On about July 28, 1975, Turkkan, Farouki, and one Harb Al Zuhair, an acquaintance of Turkkan and a businessman in Saudi Arabia, met with Reyhan at Sangamo's Springfield office. Turkkan testified that at this meeting Reyhan expressed an interest in construction contracts in the Mideast; that Turkkan explained to him that ODC was not engaged in construction, but that it was available to serve as representative and market consultants to identify projects, to introduce Sangamo to the local culture and individuals, and to generally assist in the gathering of information and related services; that ODC's fees would be geared to the fact and the size of any contract procured by the client, but that the same would range between 2 percent and 5 percent of the value of such contract, and that Sangamo then agreed to utilize ODC's services upon the stated basis.

11. Not surprisingly, that testimony is contradicted to some degree by other witnesses, but it does find support in evidentiary documents and the later conduct of the parties, which renders Turkkan's testimony

persuasive. It must be found that there was an oral agreement as between the parties, at least to the extent that Sangamo did employ ODC to render services, with the expectation of both parties that ODC would be paid if Sangamo did receive a Mideast construction contract to which the services of ODC contributed.

12. Following the July 28 meeting, in August 1975, Farouki, at the request and expense of ODC, relocated himself and his family to the Mideast. He was instructed to establish residence in Saudi Arabia. Ultimately, Farouki, on his own initiative, established his residence at Kuwait City, Kuwait, in that same month.

13. In mid–October 1975, Farouki terminated his full–time employment with ODC, yet a business relationship continued between them thereafter. The testimony of both Turkkan and Farouki, related to this, is remarkedly consistent. Though arguably subject to shadings of interpretation, the one credible interpretation is that ODC and Farouki then agreed that the latter would continue to work for ODC on a project–to–project basis, beginning with Sangamo's interest in the Motorway Project. They agreed that Farouki would continue to perform those services necessary to be performed in Kuwait in furtherance of that project, while ODC would perform those services necessary to be performed in the United States. Those parties further agreed that Farouki, for his continued service, would receive 30 percent of the profits should the efforts on behalf of Sangamo ripen into a Motorway contract. Although Farouki did subsequently request that his percentage be increased to as much as 50 percent, the more credible inference is that those requests were not accepted.

14. In January 1976, Farouki did execute a document which purported to assign to UDC his interest in the commission to be received from Sangamo.

15. Kuwait requires prequalification as a condition to the right to bid upon a construction contract. Those desiring to so bid must first file prequalification documentation with the Central Tenders Committee of the Kuwaiti government and obtain prequalification approval from that agency. Persons so qualified are then permitted to submit to the Kuwait Ministry of Public Works a bid upon construction work to be let. Kuwait also requires that any foreign entity which may desire to conduct any commercial business may do so only if the entity conducts such business through, or in association with, a Kuwaiti local agent, i. e., a Kuwaiti national who is qualified for and engaged in the particular commercial business.

16. International Trade and Market Identification is an established field of business expertise related to the identification and finding of business opportunities in foreign countries for clients located in the United States. The business was described by Arnold R. Lessard, an expert witness called by ODC, as the providing of services to nonknowledgeable persons to help such persons to bridge culture and language barriers,, meet the legal requirements such as prequalification, identify local agents or potential joint venture partners, meet the necessary persons in the foreign country, and comply with societal do's and don'ts of which the client may be unaware.

17. In about December 1975, Reyhan advised Turkkan in a telephone conversation that he wished to visit the Middle East to inspect the projects which previously had been discussed. He asked Turkkan to arrange such a trip. Pursuant to that request and suggestion, Turkkan met Reyhan in Riyadh, Saudi Arabia, in January 1976, and spent three or four days in that city. While there they met with Zuhair and discussed with him Saudi laws, regulations, and prices. They also inspected several Saudi job sites, and Turkkan made arrangements for Reyhan to meet with a Saudi construction company not related to Zuhair. From Riyadh, Turkkan and Reyhan went to Kuwait where they were joined by Farouki. While there, Reyhan was introduced to potential agents, partners, or joint venturers, including Sharif and other officials of Burhan. They also discussed with such persons the regulations related to prequalifica-

tion, bonding, and guarantee requirements. Farouki had made all arrangements for transportation and lodging in Kuwait, and transported Reyhan to various job sites.

18. After several days in Kuwait, Turkkan and Reyhan returned to Riyadh, where Turkkan introduced Reyhan to certain members of the Saudi royal family and to representatives of the Saudi construction trade. Several days were spent in Riyadh before both returned to the United States.

19. Following that January trip to the Mideast, and precedent to a second trip by both Turkkan and Reyhan in March 1976, Farouki maintained contact with Sharif and Burhan, met with personnel of the Kuwait Ministry of Public Works, and kept both Turkkan and Reyhan informed in the premises. Beginning about March 9, 1976, and daily thereafter until March 14, 1976, Farouki was in contact with the Central Tenders Committee, to determine whether the prequalification application, which was due on March 14, had been received from Sangamo. When, on the 14th, Farouki determined that such still had not arrived, he filled out so much of an application as was consistent with his knowledge as to Sangamo and submitted that application, together with a transmittal letter, on a Sangamo letterhead, to the Committee within the deadline. Shortly following March 14, 1976, Turkkan and Reyhan made a second trip to Saudi Arabia and Kuwait.

20. Ultimately, Sangamo was prequalified and thus authorized to bid upon Kuwaiti construction projects. In March 1977, Reyhan and other Sangamo officials returned to Kuwait to bid on one phase of the Motorway project, with Burhan joined as a local agent and as a subcontractor on that project. Sangamo submitted the low bid and was awarded the contract.

21. In the meantime, Farouki had remained in contact with Sharif and Burhan in Kuwait and with Turkkan and Reyhan stateside. Also, when advised by Turkkan that Turkkan was returning to Kuwait, Reyhan requested that Turkkan meet with Sharif and Burhan and discuss the prospects of Burhan entering into a joint venture with Sangamo in bidding upon the project. Turkkan did so and reported the results of the meeting to Reyhan. The rendition of service by ODC and Farouki continued until the construction contract was obtained by Sangamo.

22. The above-mentioned services rendered to Sangamo, or on its behalf, are consistent with the concept of an international trade and marketing representative, and they only partially summarize the acts and activities done by ODC and/or Farouki. The rendition of that service enabled Sangamo to successfully enter the construction contract market in Kuwait by successfully obtaining the contract for a phase of the Motorway Project.

23. The fee for market identification service is generally fixed as a negotiated percentage of the ultimate value of the contract. Under the custom and usage of the trade, the fees for construction contracts are in the range of one to five percent of the contract, and an expert in the area would reasonably expect to receive a fee of a minimum of one percent of the gross contract obtained by his client.

24. The ultimate amount of the contract obtained by Sangamo on the Motorway Project is $63,191,000.

25. In January 1977, at Reyhan's invitation, Turkkan and his wife spent several days at the home of Reyhan on the Island of St. Bartholomey. At that time Turkkan submitted to Reyhan a proposed written agreement between ODC and Sangamo, which contained provisions which made ODC the exclusive representative for Sangamo in the Middle East, and which provided that ODC would receive a commission of 1¼ percent upon all construction contracts obtained by Sangamo in that area. The agreement was never signed. The credible evidence indicates that Reyhan then voiced an objection only to the exclusive representation provisions.

26. The St. Bartholomey transaction occurred in close proximity to March 1977, when the Sangamo bid was finally submitted on the Motorway Project. There is

no credible evidence that Sangamo ever rejected the 1¼ percent proposal.

27. The relationship between ODC and Farouki, at all relevant times subsequent to October 1975, was that of employer and project–to–project employee. There is no sufficient evidence to support a finding that a joint venture relationship was ever created.

## CONCLUSIONS OF LAW

1. Because the merits of the controversy must be determined under the law of Kuwait, the court must first find and determine what that law is. The opinion testimony of expert witnesses is relevant as evidence bearing upon that determination. The court has before it the testimony of Omar Najib and the testimony of Sharif Massiouni, qualified legal experts who testified, respectively, for ODC and Sangamo. The law of Kuwait related to contracts is contained in the Law of Commerce No. 2 of 1961. That statute and the interpretive testimony provide the basis for other conclusions of law stated.

2. The formation of an express contract requires an offer and acceptance, i. e., a meeting of the minds as to the critical elements of a contract. Whenever a meeting of the minds is shown to exist, an enforceable contract is formed. Article 105.[1]

3. There is no statute of frauds under Kuwaiti law. An oral agreement is enforceable to the same purport and effect as a written agreement, upon proof that the parties did agree to the essential parameters of a contract. Article 106.

4. An express acceptance is not essential to the formation of a contract. Silence is deemed to be an acceptance under shown circumstances, which manifestly required a disavowal of the offer made. Silence must especially be deemed an acceptance if the offered service is accepted and the same "brings benefit to the one to whom it is directed." Article 108.

5. It is not essential that every element bearing upon interpretation of a contract be agreed upon, so long as there is agreement upon the cardinal elements necessary to its formation. When an offer of services is made and that offer is accepted, the validity and enforceability of that agreement is not affected by the fact that a discrete amount of compensation for the services is not precisely stated. Thus, if a range of compensation is stated in an agreement, the agreement is enforceable for the minimum scale of the range stated. If there be no range stated, but the facts of the agreement are such that the expectation of compensation is patent, that omission does not render the contract unenforceable, if there be shown an established custom and usage in the particular trade which defines a rate of compensation. Article 157.

6. A contract may be "rescinded or altered" by the agreement of the parties. Article 146. The same principles related to offer and acceptance and formation of the original contract, including acceptance by silence, apply to amendment of an existing contract.

7. The theories of quasi contract and quantum meruit are recognized by Kuwaiti law as bases for recovery. Upon proof that a party performed services for another party who, being fully aware of the premises, receives the benefits accrued as a result of the services performed, there is recognized an implied promise to pay for the services at a rate determined by the common practice of Kuwait.

8. Sangamo's defense of illegality is not supported by the law of Kuwait. In general, the statutes of Kuwait restrict "commercial business" by non–Kuwaitis. Thus, Articles 26 and 27 provide that a non–Kuwaiti may not engage in commerce in Kuwait unless such non–Kuwaiti, if an individual, conducts business through a Kuwaiti partner, or, if a company, through a Kuwaiti agent. Commercial business is generally defined by the provisions of Article 7.

---

1. All references herein are to the 1961 statute, except as expressly otherwise indicated.

9. The substance of Law No. 36 of 1964, upon which Sangamo partly relies, is pointed to the sale and distribution of goods and commodities, in that it expressly applies to the subject of "Commercial agency." Article 1, 1964. There is no evidence to support a contention that the acts of Farouki and ODC vis–a–vis Sangamo were acts of commercial agency.[2]

10. The credible evidence on the conduct and conversations of the parties manifests an intention on the part of each of the parties to enter into a contractual relationship whereby ODC undertook to represent Sangamo in the introduction of Sangamo to business opportunities in the Mideast and, specifically, the Kuwait Motorway Project, and Sangamo undertook to compensate ODC for its services, contingent upon those services leading to Sangamo succeeding in obtaining a business opportunity.

■ 11. Although the precise rate of compensation was not agreed, the credible evidence requires a conclusion that there was agreement that ODC would be compensated at a rate ranging between 2 and 5 percent of the value of any construction contract which Sangamo obtained as a result of ODC's representation and efforts. That agreement must be implied from the credible content of conversations between Reyhan, Turkkan, and Farouki in July 1975. Even if it be assumed that there was not immediate agreement, it is certain that the range of ODC's compensatory expectations was communicated to Sangamo, that ODC and Farouki proceeded to performance of their part of the undertaking with the knowledge and consent of Sangamo, that Sangamo not only acquiesced in that activity on their part, but also requested of ODC and/or Farouki specific services in support of Sangamo's aspirations, and that in those premises, Sangamo failed to speak up or disavow the proposed spread of compensation. That silence, under circumstances which would tend to compel one to speak, does constitute an acceptance and agreement under the law of Kuwait, as above summarized.

12. Although, under the law of Kuwait, resort might be had to evidence of custom and usage to supply the discrete amount of compensation, it is deemed not necessary to rely upon such evidence. The court is convinced that the discrete figure was fixed by agreement, i. e., the minimum of the range of compensation first stated by Turkkan to Reyhan, i. e., 2 percent of the Sangamo Motorway contract.

13. It must be further concluded that the above agreement was effectively amended in the course, and as a result, of the St. Bartholomey transaction. Turkkan's submission to Reyhan of a proposed written agreement which provided for a commission to ODC in the amount of 1¼ percent, was an effective offer to amend or modify the previously existing agreement. Reservations stated by Reyhan, as to the proposed text of agreement, made no reference to the 1¼ percent figure. That modified figure was submitted to him under circumstances which required him to speak.

**2.** Brief reference must be made to the deposition testimony of Muhammed Mulhim, a Kuwait attorney who states the thesis that ODC's conduct took the nature of an agency relationship, and that its claims are barred by the provisions of the 1964 law.

Mulhim's testimony is suspect for several reasons. At the time his deposition was taken, he was a member of the law firm which represented Burhan. He also represented Sangamo on a retainer. He makes no distinction between "Commercial agency" and other types of agency which are recognized by Kuwaiti law. Compare, e. g., Law No. 36, 1964, with Article 57 (Commission agents) and 591–596 (Contract agents). Mulhim relied to a great extent upon a case decision by a Kuwaiti court of appeals for his stated opinion that an unregistered agency agreement is not enforceable. Sangamo's expert, Bassiouni, testified that Mulhim's statement was a misconstruction of the ruling of that case, and that the decision has no application to the facts of this transaction.

In the context of his testimony, Bassiouni did testify that some acts done by Farouki and/or ODC may have violated Kuwaiti agency law. Upon further questioning, he specifically limited that opinion to the statement that Farouki's filing of the prequalification documents "may" have been an act of agency which violated Kuwaiti law. There is no credible evidence of the existence of the violation of any law of Kuwait which would have the effect of voiding an otherwise valid contract.

He did not communicate to ODC any rejection of the proposed modification.

14. Although the proposed written agreement submitted by Turkkan to Reyhan at their meeting in St. Bartholomey was never executed and the same never took effect, it must nevertheless be concluded from the known circumstances surrounding that transaction that the previously existing oral agreement was orally modified. That follows as a necessary consequence of Sangamo's silence in the premises, a consequence which is deemed to be fortified by the element of timing.

15. That written proposal provided that the rate of commission which ODC was to receive was 1¼ percent of the gross value of any contract obtained by Sangamo. We need not resolve conflicts in testimony regarding the circumstances of Turkkan's submission of that proposal, in view of the absence of evidence that Reyhan did disavow the proposed rate. The services to be provided by ODC were then substantially completed and the submission of Sangamo's bid on the Motorway contract was near. The demand upon Sangamo to speak was imperative. In the same sense that the July 1975 conversations provided the basis for the original contract between ODC and Sangamo, the written proposal constituted an offer by ODC to fix the discrete number of that contract at the rate of 1¼ percent. That offer, coupled with Sangamo's continued silence, ripened into an oral modification of the prior agreement.

16. ODC is entitled to a judgment against Sangamo in the amount of 1¼ percent of the ultimate gross value of Sangamo's Motorway contract of $63,191,000.

17. Alternatively, should an express contract be found not to exist under Kuwaiti law, ODC would be entitled to judgment upon an implied contract. Having accepted the benefit of services rendered to it by ODC, and having received as a result of those services a substantial business advantage in Kuwait, Sangamo became obligated to compensate ODC in conformity with the custom and usage of the trade in Kuwait. The credible evidence required a finding that a range of 1 to 5 percent of gross would customarily apply to a construction contract, which thus renders a rate of 1 percent as a measure of recovery.

18. There is no proof of any factual basis to support a conclusion that any contractual relationship under Kuwaiti law was ever created between ODC and UDC under the circumstances of this case.

19. The credible evidence and the facts above found to support the conclusion that a personal service contract related to the representation of Sangamo did exist, and continued to exist, through all relevant time periods, between ODC and Farouki, under which Farouki would be entitled to be compensated from the commissions received by ODC. However, his right of recovery would be tempered by any claims and defenses which might exist as to him, which were not pleaded, and could not be pleaded, in this suit since Farouki is not a party.

20. It was hereinabove found, and must be here concluded, that under the Farouki–ODC agreement, Farouki became entitled to receive 30 percent of net commissions.

21. There is no credible evidence to support a conclusion that a joint venture did exist between ODC and Farouki in the context of this litigation. His contract for personal services was not assignable. ODC is therefore entitled to judgment against UDC upon Count 5 of the cross–complaint.

Accordingly, IT IS ORDERED, pursuant to the court's directed findings at the close of the trial, that final judgments enter as follows:

a. For Sangamo and against ODC on Count 3 of the complaint.

b. For Sangamo and against UDC upon all counts of the intervening complaint which assert a claim against Sangamo.

c. For ODC and against UDC upon Counts 4 and 6 of the cross–complaint.

d. For ODC and against Sangamo striking the affirmative defenses based upon the statute of frauds and the amended allegations of illegality of payments.

IT IS FURTHER ORDERED, upon the remaining counts, that judgments enter as follows:

a. Upon Count 1 of the complaint, for ODC against Sangamo, for 1¼ percent of the gross contract of $63,191,000, together with its costs of suit.

b. For ODC against UDC upon Count 5 of the cross–complaint.

IT IS FURTHER ORDERED, because the court has hereinabove found and concluded that ODC would be entitled to recover against Sangamo upon alternative Count 2 of its complaint should the judgment entered upon Count 1 be disavowed, and in the interest of disposing of the whole cause, that judgment will enter dismissing Count 2 of the complaint, subject to the right of ODC to have the count reinstated upon its request should the judgment in its favor on Count 1 be overturned.