686 F.2d 498
 OVERSEAS DEVELOPMENT DISC CORPORATION, Plaintiff-Intervening
Cross-Defendant- Appellee,
and
Universal Development Corporation, Intervening Plaintiff and
Intervening Cross-Plaintiff-Appellee,
v.
SANGAMO CONSTRUCTION COMPANY, INC., Defendant-Appellant.
OVERSEAS DEVELOPMENT DISC CORPORATION, Plaintiff-Intervening
Cross- Defendant-Appellee,
and
Universal Development Corporation, Intervening Plaintiff and
Intervening Cross-Plaintiff-Appellant,
v.
SANGAMO CONSTRUCTION COMPANY, INC., Defendant-Appellee.
OVERSEAS DEVELOPMENT DISC CORPORATION, Plaintiff-Intervening
Cross- Defendant-Appellant,
and
Universal Development Corporation, Intervening Plaintiff and
Intervening Cross-Plaintiff-Appellee,
v.
SANGAMO CONSTRUCTION COMPANY, INC., Defendant-Appellee.
 Nos. 81-1222, 81-1273 and 81-1327.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 11, 1982.
Decided Aug. 10, 1982.
Rehearing Denied Sept. 7, 1982.
 
 Jerold S. Solovy, Micheal J. Rovell, Barry Levenstam, Dorothy B. Zimbrakos, Jenner & Block, Chicago, Ill., for Sangamo Const. Co., Inc.
 Gary Green, Philadelphia, Pa., John F. Bomster, Adler, Pollock & Sheenan, Inc., Providence, R.I., for Overseas Development Disc Corp. and Universal Development Corp.
 Before CUMMINGS, Chief Judge, and SPRECHER* and WOOD, Circuit Judges.
 CUMMINGS, Chief Judge.
 
 
 1
 This lawsuit began in deceptively simple fashion in October of 1977. Overseas Development Disc Corporation ("Overseas") sued to collect a brokerage fee from Sangamo Construction Company ("Sangamo"). Overseas asserted either a contractual or a restitutionary right to be paid for helping Sangamo secure a contract with the government of Kuwait to build a motorway in that country. Federal jurisdiction was based on diversity of citizenship: Overseas is a New York corporation with its principal place of business in New York City; Sangamo is a Delaware corporation headquartered in Springfield, Illinois.
 
 
 2
 The first complication arose eight months after the filing of the initial complaint. Universal Development Corporation ("UDC"), a Cayman Island corporation with its principal place of business in New Jersey, was granted leave to intervene under Rule 24(a)(2) or 24(b)(2)[1] of the Federal Rules of Civil Procedure. It claimed as the assignee of Taj Farouki, a one-time employee of Overseas and after late 1975 an executive of UDC. Farouki had granted all his rights to compensation for services on the Kuwait motorway project to UDC in exchange for being established as a Middle East business broker by UDC.[2] UDC maintained that Farouki had been a joint venturer with Overseas and that by virtue of the assignment it was entitled to sue Sangamo directly or to collect half of any award to Overseas. Additionally UDC claimed that Overseas would be liable for breach of its fiduciary obligation to Farouki if it developed that Overseas had unilaterally accepted a less favorable contract with Sangamo than the parties had originally agreed on, or if Overseas failed to make any contract at all.
 
 
 3
 What ensued was a free-for-all between Overseas, UDC, and Sangamo. There were problems with discovery; virtually no fact of any legal significance was uncontested; there were charges that evidence had been doctored; and evidentiary rulings were hotly disputed. The choice of governing law posed difficulties: the trial judge's decision to apply Kuwaiti law to all aspects of the litigation was only half the battle; discovering the content of Kuwaiti law was also baffling. The (partial and unpaginated) record on appeal runs to five bulky volumes, and it took the judge a year after the close of the trial to produce his written opinion. It is published at 502 F.Supp. 1256 (C.D.Ill.1980).
 
 
 4
 In his order, the district judge denied Overseas' expansive claim to brokerage fees for various Middle Eastern ventures Sangamo might undertake (502 F.Supp. at 1266, judgment for Sangamo on Count III of Overseas' complaint). Focusing then on the Kuwait motorway project, the judge found that Sangamo and Overseas had initially contracted for fees of 2-5% of the entire $63 million contract price (Findings of Fact (henceforth F/F) 10, 11; Conclusions of Law (henceforth C/L) 10, 11, 12), but had later modified their contract to call for fees of 1 1/4% (F/F 25; C/L 13, 14). In the event his decision was reversed on appeal, the judge made an alternate finding that Overseas should recover a 1% fee, based on quantum meruit (C/L 17). He ruled that Kuwaiti laws designed to restrict the business activities of foreign corporations were no impediment to either the contract or the quantum meruit claims (C/L 8, 9). He concluded that UDC's interest in the litigation rested on an invalid attempt by Farouki to assign a personal service contract (C/L 21) and therefore dismissed UDC's claims against both Sangamo and Overseas. Unable to adjudicate Farouki's claims because Farouki was not a party, the district judge made an advisory finding that Farouki had been an employee, rather than a joint-venture partner, of Overseas (F/F 27) and that Overseas should pay him 30% of its fee (C/L 20).[3] Finally, he denied Overseas' claim for prejudgment interest under Kuwaiti law (unpublished order, Jan. 26, 1981), and denied Sangamo's motion to dismiss the lawsuit for failure to join Farouki under Rule 19(b) of the Federal Rules of Civil Procedure (unpublished order, Feb. 4, 1981).
 
 
 5
 This appeal challenges almost every aspect of the decision below. No. 81-1222 (Sangamo's appeal) raises the Rule 19(b) issue first. It then attacks as clearly erroneous the district court's factual findings about the contract and its modification and as legal error the court's interpretation of Kuwaiti statutes. Finally it characterizes as abuses of discretion the judge's refusal to admit some evidence and his failure to rule at all on other proffers. No. 81-1273 (UDC's appeal) maintains that Farouki's assignment was valid under Kuwaiti law (or more appropriately, according to UDC, Illinois or Pennsylvania law; see note 46 infra). UDC challenges the factual findings that Farouki was an employee and that he had agreed to accept 30% of Overseas' profit as his commission. It also appeals the denial of its direct claim against Sangamo. No. 81-1327 (Overseas' appeal) is anticlimactic: it challenges only the refusal to award prejudgment interest. We affirm in part, reverse in part, and remand for a new trial on the unresolved issues.
 
 
 6
 * Some discussion of the factual background of this litigation is unavoidable. The dramatis personae are Allan Reyhan, president and chief executive officer of Sangamo; Attila Turkkan, president of Overseas; and Taj Farouki, who worked for Overseas in 1974 and 1975 and became a vice-president of UDC in October of 1975. Sangamo is in the road construction business. In the mid-1970's, curtailment of American Highway construction programs led it to seek new projects in the Middle East. Overseas at the same time was trying to establish itself as a Middle East representative for American corporations. Its services were identifying lucrative projects and helping companies deal with unfamiliar bureaucratic procedures for bidding on or negotiating deals. Farouki came to Overseas in 1974. Born in Palestine, he had emigrated to the United States in 1952, became a citizen, and settled in Illinois. He had extensive business experience and spoke fluent Arabic.
 
 
 7
 The chronology of the dealings among Sangamo, Overseas, Farouki, and UDC is as follows:[4]
 
 
 8
 1974-1975: Turkkan and Farouki made several trips to the Middle East to explore possibilities there (Tr. 32-33, 43). Allan Reyhan was independently investigating opportunities through a Turkish friend and sometime joint-venture partner (Necati Dep. at 94-95).
 
 
 9
 June 1975: Turkkan announced plans to form a new corporation, Inter-Arab Commercial Company, to concentrate on the procurement of Middle Eastern business (Tr. 60, 74, 168-169, 181). Farouki was to be employed by the new company (Tr. 34, 174, 181). At about this time Turkkan made the first overtures to Sangamo (Tr. 692-698; Exh. 15).
 
 
 10
 July 3, 1975: Farouki met with Reyhan to discuss the new company's ability to obtain negotiated jobs in the Middle East. Negotiated jobs characteristically involve greater profits and fewer risks than bid jobs. (Tr. 699, 702-703, 488-489, 1095-1096.)
 
 
 11
 July 28, 1975: Turkkan, Farouki, and Zuhair (a Saudi Arab involved in Inter-Arab) met with Reyhan. Again conversation seemed to center on negotiated jobs, particularly in Saudi Arabia (Tr. 706). Turkkan contended that Sangamo and Overseas agreed at this meeting on a brokerage contract for 2-5% of the total price of any contract Sangamo might get through Overseas' efforts (Tr. 230); Reyhan denied that any such agreement was made (Tr. 718); and Farouki did not remember any discussion of commissions (Tr. 491-492).
 
 
 12
 The district judge found that an enforceable contract had been formed, subject to later modification.
 
 
 13
 Fall 1975: Farouki went to the Middle East to work for Inter-Arab. By October it was clear that no such company existed or would be formed (Tr. 187, 189; UDC App. 56-58). Farouki settled with his family in Kuwait. He offered to continue as a salaried employee of Overseas, as a part-time employee on a salary-plus-commission basis, or as an independent contractor for Overseas (UDC App. 58). Turkkan rejected all three proposals (Tr. 412-413). Farouki became vice-president of UDC (Tr. 409, 410), but he and Turkkan continued to work together on the Sangamo account (UDC App. 67; Tr. 199, 430).
 
 
 14
 The district judge concluded that Farouki was a project-to-project employee of Overseas after October 1975.
 
 
 15
 December 12, 1975: Farouki wrote directly to Reyhan to request "my percentage of compensation for my services" (UDC App. 65). Turkkan assured Reyhan that Farouki was still working for Overseas and need not be paid separately (Tr. 717-718).
 
 
 16
 January 1, 1976: Farouki executed an employment contract and assignment with UDC (Tr. 61, 169).[5]
 
 
 17
 The district judge treated the assignment as an invalid attempt to delegate performance of a personal services contract.
 
 
 18
 Early 1976: Reyhan made a trip to Saudi Arabia and Kuwait (Tr. 718, 747). Accounts of the trip differed markedly. Turkkan and Farouki viewed it as laying the essential ground work for Sangamo's bid on the Kuwait motorway project (Tr. 81, 352, 431). Reyhan represented it as an investigation of possible negotiated jobs, during which Turkkan pursued his own separate interests and Farouki functioned as an errand boy for Sangamo and Overseas (Tr. 722-723, 732, 757-758, 968).
 
 
 19
 During this trip Reyhan met Nabil Sharif, chief engineer of Burhan Kuwaiti Trading and Contracting Company ("Burhan"). Burhan ultimately served as Sangamo's national agent, as required by Kuwaiti law, on the motorway project and was paid a fee for its services. (Tr. 137, 288-289; Exhibit 397; Necati Dep. at 33.)
 
 
 20
 March 14, 1976: Prequalification deadline arrived for bidders on the Kuwait motorway. Farouki claimed to have protected Sangamo's interests by filing an application on its behalf before the deadline (UDC App. 79-86). Reyhan said Farouki's efforts were superfluous (Tr. 757).
 
 
 21
 Late March 1976: Reyhan made a second trip to the Middle East and filed Sangamo's prequalification materials personally (MacDonald Dep. at 40-41; Tr. 757). Reyhan had further dealings with Burhan (Tr. 728-730, 759, 760-762). Farouki again raised the subject of his commission with Reyhan (Tr. 762-764). Angered, Reyhan demanded a bill; Farouki submitted one a month later for $6,670. Turkkan told Reyhan to "forget the damn bill" (Tr. 766, 910). At some point thereafter Sangamo paid Farouki $200 (Answers to Plaintiff's Interrogatories (first set), # 31).
 
 
 22
 Late December 1976: Turkkan and Reyhan met in New York. Turkkan asked for a percentage of the contract price as a commission and Reyhan rejected the proposal (Tr. 791-794).
 
 
 23
 Late January 1977: The same parties met again at Reyhan's vacation home on St. Barthelemy, an island near Guadeloupe. As Turkkan was leaving, he presented Reyhan with a draft agreement in which Overseas offered to accept a lower commission (1 1/4%) in return for the right to be Sangamo's exclusive representative in the Middle East (Exh. 269). Reyhan did not sign this agreement (Tr. 809-811, 813-814).
 
 
 24
 The district judge found that these parties had effectively modified the 1975 contract to reduce the amount of the commission. He treated Reyhan's failure to disavow the tendered 1977 agreement as acceptance of the price term.
 
 
 25
 March 1977: Reyhan and Turkkan met again in New York; Reyhan insisted that he would not accept the St. Barthelemy offer (Tr. 813-814).
 
 
 26
 March 28, 1977: Reyhan offered Farouki a fee agreement of 1/8% of the contract price, less amounts subcontracted out, to pay off Farouki and Overseas (UDC App. 108). Both Farouki and Overseas rejected this proposal (Tr. 156-157, 380).
 
 
 27
 Late March 1977 and thereafter: Sangamo and Burhan prepared the bid for the Kuwait motorway project; Sangamo was awarded the contract. Reyhan and Farouki met, and Turkkan participated by telex, but their differences remained unresolved. (Tr. 818-830.)
 
 
 28
 Turkkan claims that these events prove the existence of a contract for 2-5%, or at least for 1 1/4%. Sangamo on the contrary maintains that it never had any interest in Overseas except as a potential joint-venture partner charged with supplying construction materials. It argues that Burhan performed most of the services for which Overseas and Universal now seek compensation, and that the district court's decision will force Sangamo to pay twice. Universal agrees with Turkkan about the existence of the contracts and seeks to assert Farouki's rights against Overseas and Sangamo.
 
 II
 
 29
 We dispense first with the Rule 19(b) issue.[6] Sangamo argues that the judge was correct in finding that Farouki's purported assignment to UDC was a nullity. But, having so found, he created a classic Rule 19(b) dilemma: Farouki was so important to the litigation that it ought not to have proceeded without him under the factors enumerated in the Rule; but any attempt to join Farouki as a plaintiff would deprive the court of diversity jurisdiction, because both Farouki and Sangamo are Illinois citizens. Sangamo thinks the litigation must begin anew in state court.[7]
 
 
 30
 On the contrary, the dilemma should never have arisen, because the district judge's decision invalidating the assignment from Farouki to UDC was wrong, both as made and as re-rationalized by Sangamo.[8] The judge construed the assignment as an attempt to delegate Farouki's duty to perform personal services on the Sangamo (and other) accounts to UDC.[9] Neither the language of the agreement nor the conduct of the parties supports that interpretation.[10] Farouki continued to work on the account himself; his agreement did not involve any change in his duties or in his relationships with Turkkan on this project. He simply gave Universal his right to be paid for his services in exchange for new employment and a safety net under his existing undertakings. Nor does it matter that at the time he executed the assignment, Farouki still had work to do on the Sangamo project. He could assign contingent, as well as vested, payment rights.[11]
 
 
 31
 Sangamo points to another alleged source of assignment invalidity. Under Kuwaiti law, "an assignment shall not be effective towards the obligor or a third party unless accepted by the obligor or notified to him." Article 279 of Kuwait Law No. 2/1961, quoted at Sangamo Br. 13. The same condition applies under Illinois law[12] and generally.[13] But it has to do with the effectiveness of an assignment as far as outsiders are concerned, not with its validity as between assignor and assignee. The obligor-here Sangamo if Overseas and Farouki were joint venturers and Overseas if Farouki was only an employee-is entitled to know whom to pay. And if the obligor pays without knowledge that the right to receive payment has been transferred, he cannot be forced to pay again. The purpose of such a provision is to make the assignee bear the risks of leaving the obligor in the dark.[14] Here those risks never materialized. Neither Sangamo nor Overseas paid any money to Farouki[15] before UDC's intervention in the lawsuit gave them notice of the assignment.
 
 
 32
 Because UDC's assignment was valid[16] and gave UDC whatever rights to payment Farouki had, Farouki's interests were capable of adequate representation in the lawsuit. But UDC was the real party in interest for purposes of Rule 17(a).[17] Under Rule 19(a) Farouki would not even be a person "to be joined if feasible" if UDC were a party; a fortiori under Rule 19(b) Farouki cannot be a person whose nonjoinder is grounds for dismissal.[18] Since it was unnecessary to join Farouki, Overseas' choice of a federal forum need not be overridden.
 
 III
 
 33
 Reversing the district court's ruling about the Farouki-UDC assignment has only the limited effect of putting this case back on its feet procedurally. This Court must still consider the other grounds on which the decision below has been challenged.
 
 A. The July 1975 Contract
 
 34
 We are forced to agree with Sangamo's contention that the district court's factual findings about the July 1975 contract are clearly erroneous.[19] Although the indications are scattered through a voluminous record, there really is little controversy on this point. On the one hand, there is Turkkan's assertion that an agreement was made to pay Overseas 2-5% of the total contract price as its fee. In its eagerness to emphasize the contingent nature of Farouki's right to payment, however, Overseas elsewhere argued that "(t)he facts are undisputed that at the time of the assignment by Farouki to UDC (i.e., January 1, 1976), an agreement by Sangamo to pay a commission with respect to the Project was not in existence." Memorandum in Support of Motion for Summary Judgment on Universal's Cross-Claim, p. 7 (emphasis added). On appeal Overseas says that statement is not to be taken literally because the range of compensation had been agreed on. But there is still inconsistency in that Overseas postulates an agreement that is enforceable against Sangamo but creates no assignable rights whatsoever in Farouki.
 
 
 35
 On the other hand, Reyhan contradicted Turkkan's testimony and denied any agreement (Tr. 718; cf. 790-794, 897-899). More important, Turkkan'sversion in support of an agreement was also contradicted by Farouki, whose testimony was strongly against interest. Farouki admitted that he had no recollection that the parties discussed possible commissions at the critical July 28 meeting (Tr. 491-492). Farouki also told UDC that there was no firm agreement, a fact that goes some way to explain the language of the UDC assignment (Dep. of G. Handel, a co-owner of UDC, at 57-58).[20]
 
 
 36
 In addition there was circumstantial evidence that Sangamo would not have agreed to pay a commission in this range to Overseas. The July 28 meeting was only the second the two companies had had, and the first involving both Reyhan and Turkkan.[21] The immediate impetus for the meetings was Turkkan's project to form the Inter-Arab Commercial Company, which would engage in commercial representation. But Inter-Arab was not yet formed and, as matters turned out, never materialized. It seems unlikely that Sangamo would have made a commitment to pay at least the going rate to a new and untried broker.[22] Furthermore, Sangamo was initially as interested in finding joint-venture partners for its foreign activities as it was in finding a broker, and at that time it may well have been negotiating with both Overseas and the Saudi Arab Zuhair for that reason. Overseas had an established import-export business (Tr. 26-27, 277, 719-724, 968), and Zuhair owned several construction companies in the Middle East (Tr. 707). Thus the fact of the meeting does not invite any inference that brokerage activities were its focus.
 
 
 37
 Finally, an agreement to pay a commission somewhere in the 2-5% range,[23] while it is not so indefinite as to be unenforceable,[24] does raise a question: did the parties intend to be bound or were they still negotiating?[25] As Professors White and Summers have noted in the context of the Uniform Commercial Code,[26] ambiguities about price can indicate either that the parties did not intend to conclude a contract or that they preferred to leave the price term for future specification. The district judge assumed the latter,[27] without ever squarely facing the contract formation issue.[28] But the equivocal testimony of Turkkan,[29] which was severely undercut by other direct and circumstantial evidence, did not provide an adequate factual basis for finding a contract.
 
 B. The 1977 Contract
 
 38
 It is clear from the foregoing discussion that no 1975 contract existed to be modified by the 1977 proposal. Nor are there sufficient indications of offer and acceptance to justify treating the 1977 proposal as an independent contract.
 
 
 39
 Turkkan's offer to Reyhan at the St. Barthelemy meeting had two facets: he would accept a lower commission (1 1/4%), if he could also be Sangamo's exclusive Middle East business broker. Reyhan refused to grant Overseas exclusive rights.[30] The district judge tacitly recognized as much when he found for Sangamo on Overseas' Count III, which sought commissions on Sangamo's additional Middle Eastern ventures.[31]
 
 
 40
 Nonetheless, the district judge found that Reyhan had accepted Turkkan's offer to reduce the commission by failing to disavow it. Kuwaiti[32] and Illinois[33] law both recognize the principle that a contract offer can be accepted by silence-in circumstances where there is a clear duty to speak out. Had Reyhan been silent, his silence might not have met this test. The parties' dealings to this point-involving ambiguities about negotiated or bid jobs, opportunities in Saudi Arabia or Kuwait, Overseas' role as broker or joint venturer-all militate against construing silence as acceptance here. But Reyhan did not keep silent. Initially his attention was focused on the exclusivity term and he objected to it.[34] He also voiced dissatisfaction with the commission percentage.[35] Nothing in the negotiations suggested that the terms were not intertwined, or that Reyhan could choose which parts of the package he would accept without creating a counteroffer. The district judge erred in disentangling the terms and in treating Reyhan's more vocal objections to one as acquiescence in the other.
 
 C. The Quantum Meruit Claim
 
 41
 There is no real dispute about the validity of Overseas'[36] quantum meruit claim under any law that might be applied. Overseas intended to render services for compensation; Sangamo contemplated paying something for those services; and there have been both detriment to Overseas and benefit to Sangamo. Sangamo had raised various statutory defenses to bar contract enforcement,[37] and likewise raises them to bar the restitutionary claim.[38] But the district judge found that the statutes were not an impediment to relief on either theory.[39]
 
 
 42
 The difficulty with the quantum meruit claim, however, lies in the measure of damages. The trial judge heard expert testimony that the normal rate for brokerage services in circumstances like these was 1-5% of the contract price. He therefore awarded 1%, designing his order so that if the explicit contract claim based on the 1975 contract as modified in 1977 were reversed on appeal the restitutionary claim would be reinstated (C/L 17). Sangamo argues that the expert testimony was irrelevant, since Kuwaiti law limits recovery for "enrichment without legal cause" to the impoverishment suffered by the plaintiff or the enrichment procured by the defendant, whichever is less. Br. 41 and n. 30, quoting M. Plainiol, 2 Treatise on the Civil Law § 937B (11th ed., Louisiana State Law Institute trans. 1939). From that general proposition of civil law, Sangamo concludes that recovery should be limited to Overseas' out-of-pocket expenses[40] or-if the record is inadequate-that the case should be remanded on the damage issue.
 
 
 43
 We agree that the record is inadequate[41] and that the district court erred in giving conclusive weight to the expert testimony. The court apparently confused implied-in-fact contracts, whose missing terms can be supplied by custom and usage, with implied-in-law contracts, which are not contracts at all, but devices to prevent unjust enrichment. But Sangamo is also wrong in saying that the expert testimony is irrelevant. It is germane to the assessment of whether Overseas' actual expenses were reasonable and of how much monetary benefit Sangamo received.
 
 
 44
 Other facts are also germane, but the district court's evidentiary rulings prevented them from being clearly set forth. For example, the trial judge should not have excluded Sangamo's evidence that it sought a joint-venture arrangement with Overseas (Sangamo Br. 44). While that evidence might not ultimately be credited,[42] Sangamo was entitled to have it considered for its bearing on exactly what services were connected with brokerage activities and how much they were worth. Sangamo should also have been allowed to put in evidence about Turkkan's and Farouki's other activities in the period when they were performing services for Sangamo. It is relevant to the quantum meruit claim to be able to segregate what was done to further Sangamo's interests from what was done for other clients or for Overseas' own projects. Similarly, it was error to exclude all evidence of the risk and profitability of the motorway contract itself (Br. 46). That evidence would have been admissible only for the limited purpose of valuing the brokerage services, which must correlate in some way to the expected profit margin of the opportunities the broker will find. Of course Sangamo could not use its narrow profit margin on the completed project to limit Overseas' recovery. Cost overruns, delays, and events unforeseen at the time Overseas was employed were risks to be borne by the contractor, not the broker.
 
 
 45
 In view of the necessity of remanding this case, we deal briefly with Sangamo's final evidentiary objection-that the court below postponed ruling on the admissibility of some evidence and thus created a record from which appeal is difficult (Br. 47-49). The case became increasingly complicated as it unfolded, and much of the evidence must have seemed relevant at some stages and irrelevant at others. Some of the evidence is only clearly relevant now, in light of our treatment of the merits on appeal. The conditional rulings probably seemed, at the time, to be one way to expedite matters. Nonetheless, the trial judge and the parties should, before the final decision is rendered, make sure that definitive rulings have been made on all the evidence proffered.
 
 D. Overseas' Claim for Prejudgment Interest
 
 46
 Overseas' claim for the denied prejudgment interest was based on Kuwait Law No. 2/1961, Article 165. Like Ill.Rev.Stat. 1981, ch. 74 § 2, that provision allows interest to accrue before judgment if "the obligation is a sum of money the amount of which was known when the obligation arose and the debtor delays in paying it." If the explicit 1975 contract (modified in 1977) found by the district court was not definite enough to trigger prejudgment interest, the restitutionary claim on which we predicate recovery is even less so. Sangamo is not to be penalized for litigating the extent of its obligation to Overseas.
 
 IV
 
 47
 We add a few remarks about the proceedings on remand. In the new trial, three issues must be resolved. First, the court will have to determine the nature of the Farouki-Overseas relationship, because that in turn will establish what UDC is entitled to receive and from whom. It will also govern whether UDC has succeeded to any cause of action against Overseas for breach of a fiduciary duty. We do not necessarily disagree with the district court's factual findings that the relationship was an employment contract, that Farouki was entitled to 30% of what Overseas recovered, and that UDC has no suit against Overseas for its failure to obtain a binding contract with Sangamo. But it would be improper to treat these findings as the law of the case in further proceedings because they may have been colored by the trial judge's erroneous belief that the assignment was invalid and his consequent desire to shape the judgment to limit the prejudicial effects of that error.
 
 
 48
 Second, the court must hear evidence on the quantum meruit claim. In order to decide how much money Overseas should receive in restitution, the court should permit the parties to explore in some detail exactly what services were performed, how much they cost, and what benefit inured to Sangamo from them. Especially if the case is tried without a jury, as it was the first time, much of the evidence excluded in the first trial should be admitted, albeit for limited purposes, in the second.
 
 
 49
 Third, the choice of law issues will appear in a somewhat different light in the new litigation. The district judge applied Illinois choice-of-law rules for contracts, under Klaxon v. Stentor Electric Manufacturing Company, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 and concluded that Kuwaiti law governed all the substantive issues in the case.[43] A quantum meruit claim does not sound in contract, but in restitution. Although Illinois seems not to have adopted a choice-of-law rule for quantum meruit cases,[44] we think it would follow the approach of the Second Restatement (as it does for torts and may be about to do for contracts-see note 43):[45]
 
 
 50
 § 221. Restitution
 
 
 51
 (1) In actions for restitution, the rights and liabilities of the parties with respect to the particular issue are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
 
 
 52
 (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
 
 
 53
 (a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship,
 
 
 54
 (b) the place where the benefit or enrichment was received,
 
 
 55
 (c) the place where the act conferring the benefit or enrichment was done,
 
 
 56
 (d) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
 
 
 57
 (e) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.
 
 
 58
 These contacts are to be evaluated according to their relative importance with respect to the particular issue.
 
 
 59
 Furthermore, the district judge in the first trial did not make a separate inquiry into the law that should govern the parties' rights under the Farouki-UDC assignment, because he held it invalid. It is not clear on this record where that contract was made, or where it was to be performed,[46] but both questions must be answered before the Illinois choice-of-law rule for contract cases-in either its traditional or its emerging form-can be applied.
 
 
 60
 The decision appealed from is affirmed in part, reversed in part, and remanded for a new trial on the remaining issues. Overseas shall bear its own costs in No. 81-1327; Overseas and Sangamo shall share the costs equally in Nos. 81-1222 and 81-1273. Circuit Rule 18 shall apply.
 
 
 
 *
 Judge Sprecher heard oral argument and participated in the conference in this case, but died before the opinion was formulated. At the post-argument conference Judge Sprecher voted for the outcome endorsed in this opinion
 
 
 [1]
 The magistrate who granted UDC leave to intervene did not decide whether the intervention was mandatory (Rule 24(a)) or permissive (Rule 24(b)). Permissive intervention requires an independent jurisdictional basis, which UDC could show: it was diverse to both Sangamo and Overseas
 
 
 [2]
 The assignment is quoted in full in note 5 infra
 
 
 [3]
 Overseas' fee was computed as $780,887 on the basis of the contract, or $631,910 on the quantum meruit claim
 
 
 [4]
 This narrative is based on the trial judge's findings, supplemented by uncontradicted evidence in the record. The descriptions of events involve no new weighing of evidence by this Court. Critical findings of the trial judge, challenged on appeal, are specially indicated
 
 
 [5]
 The Assignment (UDC App. 109) provides:
 Know All Men by these presents that I, Taj J. Farouki (Assignor), hereby sell, assign and transfer to Universal Development Corporation (Assignee), a Cayman Island corporation, all of my right, title and interest in and to any and all causes of action, choses in action, and claims against, as well as my right to participate in transactions with, persons, companies and entities, domestic and foreign, which I now have, or may in the future have as a result of my employment, by Assignee, arising out of agreements, services, and monies due me with respect to my former employment and my current arrangement with the Overseas Development Corporation (ODC), as well as with respect to projects involving Sangamo, the Kuwait Motorway, Bell of Canada, GE-TRW, and all other projects I have worked on in the Middle East prior to the date hereof, for which compensation may be due to me, or in connection with which I have commenced discussions.
 The consideration for this Assignment is One Dollar ($1.00), to me in hand paid, receipt of which is hereby acknowledged, as well as Assignee's agreement to employ me as a vice president for at least one year at a salary of at least $24000.00 per year, and Assignee's undertaking to pay all the outstanding expenses incurred by me in connection with my work in the Middle East now due. In addition I have been issued 200 shares of the common stock of Universal Development Corporation, receipt of which is hereby acknowledged.
 
 
 [6]
 Rule 19 provides:
 (a) Persons to Be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.
 (b) Determination by Court Whenever Joinder Not Feasible. If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.
 
 
 [7]
 Support for Sangamo's conclusion is found in Bry-Man's, Inc. v. Stute, 312 F.2d 585 (5th Cir. 1963). It is Sangamo's premise that Farouki is an indispensable party that we must reject
 
 
 [8]
 In view of our decision about the assignment, we need not reach the timing of Sangamo's motion to dismiss, which Overseas (Reply Br. 45-46) urges as a proper basis for its denial
 
 
 [9]
 C/L 19, 21
 
 
 [10]
 As a general proposition, rights to receive compensation are freely assignable; duties cannot be delegated where performance by a particular person has been bargained for. See A. Corbin, 4 Corbin on Contracts § 865 (1951 and 1980 supplement). The language of Farouki's assignment (quoted in note 5 supra) is not ideally clear, in part because it seems to have two objects in mind. It secures for UDC all rights to payment arising out of Farouki's activities before he joined UDC. It also safeguards to UDC any rights Farouki may acquire during his new employment, thus preventing him from making a similar assignment if he should change employers again. The phrase the district judge must have focused on is "my right to participate in transactions with persons, companies and entities, domestic and foreign * * *." That phrase is facially capable of having the general sense "to share in an undertaking" or the more specialized financial sense, "to share in the profits." Webster's Unabridged Dictionary, 2d ed., s.v. "participate." Given the ambiguity, doubts should be resolved by looking at the understanding the parties evinced by their actions. See 3 Corbin on Contracts § 558 (1960). Cf. Turkkan's December 27, 1976 letter to Farouki (UDC App. 100): "What you do with your share of the profits is none of our business. You may give all or some of this commission to Universal Development Corporation."
 Universal had only a right to receive whatever Farouki was to be paid. It is immaterial to the validity of the assignment whether Farouki was to receive emolument as a joint venturer with Overseas or as Overseas' project-to-project employee, or whether Sangamo was obligated to pay by contract or by operation of law.
 
 
 [11]
 Restatement (2d) of Contracts § 152: "The fact that a right is conditional does not prevent the assignment before the condition occurs." Id. at § 153: "Except as otherwise provided by statute, an assignment of a right to payment expected to arise out of an existing employment or other continuing business relation is effective in the same way as an assignment of an existing right."
 
 
 [12]
 See, e.g., Spoor v. Q & C Co., 162 F.2d 529, 532 (7th Cir. 1947) (Illinois law)
 
 
 [13]
 Corbin, op. cit. (n. 10), § 894
 
 
 [14]
 Id. at § 894: "A payment made by the obligor to his original creditor is fully operative in defense against an assignee if it was made in good faith without notice, actual or constructive, of the assignment. It is otherwise of payments made with such notice or with knowledge of facts sufficient to put the obligor on inquiry" (p. 590). "As to discharges prior to notice, the rule applicable to the assignee is caveat emptor * * *" (p. 589)
 
 
 [15]
 We treat Sangamo's $200 payment (p. 9 supra) as de minimis
 
 
 [16]
 I.e., it was enforceable under the applicable substantive law, not a sham transaction, not a mere power of attorney, and not a collusive arrangement to create diversity jurisdiction, 3A Moore's Federal Practice P 17.09(1.-1) at 17-83 to 17-84 (1982)
 
 
 [17]
 "Every action shall be prosecuted in the name of the real party in interest." F.R.Civ.P. 17(a). Cf. 3A Moore's Federal Practice P 17.09(1.-1) at 17-84: "The federal courts * * * and all of the state courts * * * have been in full accord in holding that the unconditional assignee of a complete chose in action is the real party in interest and suit must be brought in his name."
 
 
 [18]
 Unless local law qualifies the rights of the assignee (e.g., of certain tort claims), or the assignor has repudiated the assignment, or the assignment is wholly executory, the assignor is not an indispensable (Rule 19(b)) party. Even where the assignment is partial, the assignor and the assignee may be necessary parties, but they will not be indispensable (Rule 19(b)) parties. Id. P 19.14(1) at 19-265 to 19-267
 
 
 [19]
 It is always difficult to quarrel with the factual findings of a district judge. However, the findings in question (F/F 10 and 11) are not inconsistent with a contrary result, and the legal inferences they generate are broad and conclusory:
 C/L 10. The credible evidence on the conduct and conversations of the parties manifests an intention on the part of each of the parties to enter into a contractual relationship whereby ODC (Overseas) undertook to represent Sangamo in the introduction of Sangamo to business opportunities in the Mideast and, specifically, the Kuwait Motorway Project, and Sangamo undertook to compensate ODC for its services, contingent upon these services leading to Sangamo succeeding in obtaining a business opportunity.
 C/L 11. Although the precise rate of compensation was not agreed, the credible evidence requires a conclusion that there was agreement that ODC would be compensated at a rate ranging between 2 and 5 percent of the value of any construction contract which Sangamo obtained as a result of ODC's representation and efforts. That agreement must be implied from the credible content of conversations between Reyhan, Turkkan, and Farouki in July 1975. Even if it be assumed that there was not immediate agreement, it is certain that the range of ODC's compensatory expectations was communicated to Sangamo, that ODC and Farouki proceeded to performance of their part of the undertaking with the knowledge and consent of Sangamo, that Sangamo not only acquiesced in that activity on their part but also requested of ODC and/or Farouki specific services in support of Sangamo's aspirations, and that in those premises, Sangamo failed to speak up or disavow the proposed spread of compensation. That silence, under circumstances which would tend to compel one to speak, does constitute an acceptance and agreement under the law of Kuwait * * *.
 
 
 [20]
 See notes 5 and 10 supra
 
 
 [21]
 See the chronology set out at pp. 501-502 supra
 
 
 [22]
 There was expert testimony at trial that the rate of compensation in construction brokerage contracts was 1-5% (C/L 17, Overseas Reply Br. at 33). Nothing suggests that every new entrant in the field could command the going rate
 
 
 [23]
 Such an agreement would have produced a commission to Overseas of $1,260,000-$3,150,000 on the Kuwait motorway project
 
 
 [24]
 See generally A. Corbin, 1 Corbin on Contracts §§ 95-102 (1963 and 1980 Supplement)
 
 
 [25]
 Kuwait law 2/1961, Art. 115, provides: "A preliminary agreement whereby both parties undertake to conclude a specific contract in the future shall not be valid unless the essential matters of the contemplated contract and the time limits of conclusion are specified." The last clause apparently covers options
 
 
 [26]
 J. White and R. Summers, Handbook of the Law under the Uniform Commercial Code 116-117 (2d ed. 1980)
 
 
 [27]
 He construed the contract for a 2-5% commission as a contract for a discrete 2% (C/L 5)
 
 
 [28]
 C/L 11 (quoted in note 19 supra) speaks of acceptance by silence as an alternative basis for finding that a contract was formed in 1975. This theory is discussed in detail in Part III B infra, esp. note 33
 
 
 [29]
 There was also a letter, purportedly from Turkkan to Reyhan, dated August 4, 1975. It mentioned commissions of 3-5%, with a reduction to 2% for large projects. Sangamo has attacked the letter as a fabrication (Br. 35 and n. 27). At oral argument Overseas did not respond directly to the charge, arguing only that credibility issues were in the hands of the district judge. We do not pursue the matter, except to note that the judge placed no specific reliance on this letter and that-even if it is genuine-it reflects terms that are different from the ones Turkkan testified to and the district judge found
 
 
 [30]
 See Record on Appeal, vol. II, tab 27 (Turkkan's testimony that in exchange for "total exclusivity" he "should give (Reyhan) the lowest figure we can accept"); and tab 30 (Turkkan's testimony that Reyhan's response was, "Attila (Turkkan), we may include Saudi Arabia, that may be all right. But I don't think I can agree to commit myself to every and each country in the Middle East. Nonetheless, I shall show this agreement to my lawyers and let you know the outcome."). See also id., tab 23 (February 3, 1977 letter from Turkkan to Farouki): "I have given (Reyhan) a draft agreement for the commission and he promised to show it to his lawyers and let me have their reaction shortly. Nevertheless, he will not sign any contract or agreement with us until he meets with Burhan and sees how everything fits into each other."
 To balance this evidence there are only Turkkan's assertion that "(Reyhan) agreed to commission of one and a quarter percent" (id., tab 30), and a letter from Turkkan to Reyhan, dated Feb. 8, 1977 (Exh. 278). Sangamo also questions the authenticity of the Feb. 8, 1977, letter (Br. 39).
 
 
 [31]
 502 F.Supp. at 1266 (finding for Sangamo on Overseas' Count III). Count III is not explicitly based on the exclusive representation clause. It reads in relevant part:
 
 
 [14]
 Plaintiff says that the contract and arrangement it has made for the defendant in Kuwait will, in all likelihood, result in the defendant obtaining contracts for further work on the remaining phases of the Kuwait Motorway Project, and other business in Kuwait and the Middle East, in which plaintiff has been the procuring cause of contracts for the defendant
 
 
 [15]
 Plaintiff says that to the extent the defendant obtains such business as a result of contacts and assistance already furnished to the defendant, the plaintiff will be entitled to further finder's fees and brokerage commissions in the amount of 1 1/4% (of) the gross amounts of such contracts
 
 
 [32]
 Kuwait Law 2/1961, Art. 108:
 Expression cannot be attributed to a silent person. However, where an expression is needed, silence shall be considered acceptance.
 Silence shall, in particular, be deemed to be an acceptance where previous dealings existed between the contracting parties and where the offer relates to such dealings or where the offer results in a benefit to the offeree.
 
 
 [33]
 See, e.g., Roberts v. Buske, 12 Ill.App.3d 630, 632-633, 298 N.E.2d 795 (5th Dist. 1973): "Under ordinary circumstances silence cannot be relied on to establish an acceptance of an offer to enter into a contract. (Corbin on Contracts, Vol. 1, sec. 72.) We do not preclude the possibility of an implied acceptance being established in certain circumstances."
 Illinois and Kuwaiti law are in accord that "a single transaction does not establish a course of conduct or course of dealing sufficient to constitute an implied acceptance based on silence, and * * * acceptance cannot be presumed from a mere failure to decline a proposal." Roberts, supra, 12 Ill.App.3d at 632, 298 N.E.2d 795. That vitiates the district court's alternate ground for finding a 1975 contract (see notes 19 and 28 supra).
 
 
 [34]
 See note 30 supra
 
 
 [35]
 Turkkan's description of the meeting, in the February 3, 1977 letter to Farouki, contains the following passage:
 (If Burhan is also to have a commission, Reyhan) will not pay more than 1%. Otherwise our commission will be minimal. He would prefer to pay all commissions to one party and preferably to Burhan. I certainly do not like this. However, we have not reached any conclusions. Record, vol. II, tab 23.
 This suggests that the amount and method of payment of Overseas' commission remained unresolved, and that Turkkan understood why Reyhan had not made a decision. In March 1977 Reyhan made another, more explicit rejection (Exh. 323).
 
 
 [36]
 Here and in the text that follows, "Overseas" is shorthand for Overseas and UDC as Farouki's assignee, if Farouki was a joint venturer with Overseas
 
 
 [37]
 Sangamo Br. 21-30
 
 
 [38]
 Id. at 40
 
 
 [39]
 C/L 8 and 9 and n. 2. Sangamo raises and the district court dealt with a number of nice questions about the meaning and effect of Kuwaiti law. Sangamo also urges that we stay all proceedings while we certify questions to the highest court of Kuwait, a procedure it claims we could invent by analogy to Circuit Rule 13
 We decline to disturb the district judge's decision on this aspect of the case, although we realize that Fed.R.Civ.P. 44.1 allows us to treat it as a legal, rather than a factual, conclusion. Sangamo presented conflicting and ultimately unpersuasive evidence (by testimony and affidavit) that (a) Overseas and Farouki had violated the relevant protectionist provisions of Kuwaiti law; and (b) Overseas and Farouki would be precluded, under the door-closing provisions of Kuwait Law No. 36 of 1964, from seeking recovery in a Kuwaiti court. If both those propositions were true, it is likely that an Illinois court, using substantive Kuwaiti law, would not refuse to apply the door-closing doctrine on public policy grounds.
 The main difficulty is that Sangamo in fact had the required Kuwaiti agent, Burhan, and that Overseas and Farouki dealt extensively with Burhan. Thus the purpose of the Kuwaiti provisions-to garner some of the benefits of economic development for native Kuwaitis-was satisfied. Any derelictions seem to have been minor and inadvertent, and an excessively technical reliance on them would only create a windfall for Sangamo without advancing any Kuwaiti interest.
 
 
 [40]
 Sangamo says that the only evidence of damages was Farouki's invoice in April of 1976: it listed $6,670 worth of services. Sangamo concedes that a like amount could be assumed for the year between the invoice and Sangamo's successful bid. (Br. 42-43.)
 
 
 [41]
 For example, Farouki's invoice might not reflect all his expenses since UDC was advancing him additional funds, or his expenses might have been larger in the second year. There was no evidence at all of expenses incurred by Turkkan on Sangamo's behalf
 
 
 [42]
 Like Overseas on the subject of the 1975 contract (Part III A supra), Sangamo is in a somewhat inconsistent position. To show its interest in Overseas as a joint-venture partner, it emphasizes that "Turkkan presented himself to Reyhan as a businessman engaged in brokering construction materials" (Br. 4). To show how little Overseas' brokerage services were worth, it emphasizes the less conventional side of Overseas' business: "On both of these trips (to Saudi Arabia and Kuwait), Turkkan carried two suitcases full of brochures on various products ranging from communications equipment to bulletproof vests to beefalo, and he spent the bulk of his time peddling these items to local merchants" (Br. 43)
 
 
 [43]
 The Illinois rule is apparently that "the law of the place of performance governs the construction and obligations of the contract when the place of making and the place of performance differ, if the agreement is to be wholly performed in one jurisdiction. If more than one place of performance is involved, the place of making of the contract governs its construction and obligations." Charles O. Finley & Co., Inc. v. Kuhn, 569 F.2d 527, 542 (7th Cir. 1978), certiorari denied, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (citations omitted)
 There is some indication that the Illinois rule may be changing. In Champagnie v. W. E. O'Neil Construction Co., 77 Ill.App.3d 136, 32 Ill.Dec. 609, 395 N.E.2d 990 (1st Dist. 1979), the Second Restatement's "most significant contacts" test was extended from tort to contract claims.
 
 
 [44]
 Sangamo's Motion for Summary Judgment, p. 35
 
 
 [45]
 We realize that, in making a choice, we are "determin(ing) what the (Illinois) courts would think the (Kuwaiti) courts would think on an issue about which neither has thought." Nolan v. Transocean Air Lines, 276 F.2d 280, 281 (2d Cir. 1960) (Friendly, J.), vacated in light of change in applicable state law, 365 U.S. 293, 81 S.Ct. 555, 5 L.Ed.2d 571
 
 
 [46]
 UDC has argued that Pennsylvania law should govern the assignment contract under the traditional Illinois rule, because the parties agreed there and performance was to take place in a variety of locations (Reply Br. 10-11). But UDC confuses the performance of the assignment contract with the performance of Farouki's various business ventures