**Howard B. PASHMAN,
Plaintiff-Appellant,**

v.

**CHEMTEX, INC., Defendant-Appellee.**

**No. 1265, Docket 87–7240.**

United States Court of Appeals,
Second Circuit.

Argued June 18, 1987.

Decided July 17, 1987.

Philip Esterman, New York City (Gideon J. Karlick, Esterman & Esterman, New York City, of counsel), for plaintiff-appellant.

Wayne A. Cross, New York City (Karen J. Pordum, Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City, of counsel), for defendant-appellee.

Before OAKES, MESKILL, and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

This appeal from a grant of summary judgment against plaintiff Howard Pashman requires us to assess the meaning of "pretax profits", as used in Pashman's employment agreement with defendant Chemtex, Inc., 664 F.Supp. 701. This agreement called for Pashman to receive a "participation of ten [10] percent of the pretax profits on all sales made by" him. Because the meaning of this contract is clear, and as applied to the sale at issue entitled Pashman to no more, and perhaps less, than he has already received, we agree with the district court that Pashman raises no "genuine issue of material fact", Fed.R.Civ.P. 56, and therefore affirm.

## BACKGROUND

Much of the factual background of this case is undisputed. In 1977 Pashman went to work for Chemtex as a salesman of paint plants. His compensation was established by a clause in his employment contract that provided:

Your compensation for these services will be a participation of ten [10] percent of the pretax profits on all sales made by you. A draw against this participation in the amount of $3,500 per month will be paid to you monthly. Participation will be paid, net of draws, on the basis of 50% payable on contract effectuation and 50% payable on the acceptance of the plant by the customer.

Under this agreement Pashman participated in the sale of only one plant, to Egyptian businessman Adel Khalil. The plant was to be constructed in Egypt.

By the terms of the sale, Chemtex agreed to sell its "equipment, formulae, and technical services" to Khalil for $7.6 million. Khalil, Chemtex, and another party (Issa Nakleh) formed an Egyptian corporation, the Egyptian-American Paint Company, to facilitate the transaction and eventually purchase the plant from Khalil. Chemtex holds 36.67% of the equity in the company, Khalil holds 60%, and Nakleh the remaining 3.33%.

In April 1981, three years after negotiating the Egyptian sale, Pashman quit his job at Chemtex. Based on his draw-against-commission, he had received a total of $162,752 from Chemtex.

Later in 1981 the terms of the sales agreement between Chemtex and Khalil were altered. The sales price increased from $7.6 million to $10.1 million, and Chemtex formed an Austrian subsidiary, as a condition of obtaining Austrian financing, to export many of the materials and equipment to be used in the project.

In 1985, Pashman filed suit against Chemtex alleging that he should receive 10% of the $10.1 million sale price received by Chemtex, less the $162,750 he had already drawn. While his prayer for relief asked for damages of $5 million, it appears that his actual claimed damages are $847,250.

Chemtex moved for summary judgment, submitting documents showing it had actually lost money on the transaction, approximately $722,000. Since the deal generated no profits for Chemtex, it argued that Pashman is entitled to no commission and thus that Pashman was in fact $162,750 ahead.

In response, Pashman argued that the term "profits" in his contract actually meant "gross revenues", and that Chemtex's accounting—which deducted costs from total revenues—was therefore inaccurate, creating an issue of fact as to actual profits.

Judge Walker concluded that the term "pretax profits" was clear on its face, saying that "as a general rule, a court should not interpret the word 'profits' as synonomous with 'revenues,' but instead read the term 'profits' as referring to 'revenues minus costs.' * * * Plaintiff has provided no evidence to show that a different meaning was intended when the parties used the

term 'pretax profits' in plaintiff's employment contract." *Pashman v. Chemtex, Inc.*, 664 F.Supp. 701, 704 (S.D.N.Y.1987). Pashman now appeals.

## DISCUSSION

 It is plain that the district court was correct in stating the general rule that profits are not equal to revenues. Indeed, we would have thought that no citation was necessary for the proposition. If citation is needed, the cases mentioned by the district court, *Catalano v. J.C. MacElroy Co.*, 13 A.D.2d 914, 215 N.Y.S.2d 873 (1st Dep't 1961), and *Martin v. City of New York*, 264 A.D. 234, 35 N.Y.S.2d 182 (1st Dep't 1942), provide sufficient support. Perhaps the first rule of accounting is that the black ink of profit is not entered into the ledger until expenses are deducted from gross revenues.

Chemtex's gross revenues on the Khalil sale are agreed by the parties to be $10.1 million. Thus, the only dispute centers on how much Chemtex was entitled to deduct as expenses in calculating pretax profits.

We begin by noting what is not at issue on this appeal. Since Pashman did not below challenge the propriety of each individual cost deducted by Chemtex, he cannot seek to create an issue of fact on appeal by claiming that this or that expense was not proved by Chemtex. *See Bailey Enterprises, Inc. v. Cargill, Inc.*, 582 F.2d 333, 334 (5th Cir.1978) (per curiam); 6 Moore's Federal Practice ¶ 56.27, at 56–1557 (2d ed. 1985) ("An appellant may not, as a general rule, overturn a summary judgment by raising in the appellate court an issue of fact that was not plainly disclosed to the trial court."). Pashman's vague challenges below about the "audit trail" submitted by Chemtex in justification of its claimed expenses did not suffice to raise a genuine issue of fact. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Project Release v. Prevost*, 722 F.2d 960, 968–69 (2d Cir.1983).

 Pashman must therefore stand or fall on his claim that each and every one of the "costs of sale" claimed by Chemtex is invalid simply by reason of Chemtex's purchase of an equity share in the joint venture with Khalil. This step, according to Pashman, served to make Chemtex its own "customer"—in effect, the purchaser as well as the seller of the plant—and magically transformed the costs into "capital investments", leaving the entirety of the gross revenues, $10.1 million, as "profits". This is the issue of fact Pashman articulates in his brief on appeal as precluding summary judgment.

We disagree. This means of financing the paint plant, far from making Chemtex the purchaser of the plant, instead was merely a means of bringing about the sale. It is undisputed that purchasing the equity share in the project was a necessary expense for Chemtex to close the deal and obtain financing for it. It is further undisputed that Pashman was well aware of this necessity when he negotiated the deal for Chemtex. Under these circumstances, it borders on the frivolous for Pashman to claim that the costs Chemtex incurred on this sale were really the company's "capital expenses".

Indeed, under the circumstances of this transaction, the $1.9 million Chemtex spent toward purchasing its share in the paint company was itself a cost of the sale. While this is true only to the extent that the cost ($1.9 million) exceeds the value of what Chemtex received for it (the equity share in the project), Pashman does not dispute the statement of John M. Ryzewic, a Vice-President of Chemtex, in his affidavit that "[b]ecause of the Project's massive delay and cost overruns, the volatile nature of Egypt and Egypt's foreign exchange problems, Chemtex currently treats its equity participation * * * as a 100 percent selling expense." In other words, the value of Chemtex's equity share is zero.

In relying solely on the form of and label attached to the transaction, Pashman fails to raise any issue of fact. The mere fact of a purchase of equity will not blind us to the true nature of the underlying transaction;

## 632

Chemtex sold a paint plant to Khalil, and incurred certain expenses in doing so—including having to purchase equity in the paint company. Pashman has not produced any evidence that the equity expenditure's usefulness extended beyond facilitating the Egyptian plant sale. Moreover, Pashman has not intelligibly argued that the purchase of equity in this case altered the character of other project expenses to make them "capital expenditures".

Pashman has thus not shown that Chemtex incorrectly calculated its net loss on the transaction. As of the date of the motion for summary judgment, Chemtex had lost some $722,000 on the deal, meaning that Pashman is entitled to no commission. Indeed, since he has already drawn $162,750 against his commission, he would not be entitled to further compensation until net profits pass $1.6 million. Thus, even if the $1.9 million in equity is not deducted from Chemtex's revenues, there was still no issue of fact raised, since it would bring Chemtex into the black on the transaction only to the extent of $1.2 million. In fact, since Pashman is entitled to only half his commission until the project is actually completed, he would be ineligible for any further compensation (beyond the $160,000 he has already received) until profits exceed $3.2 million (when the 5% to which he is thus far entitled would be more than $160,000).

In short, on any conceivable construction of the facts, Pashman is not entitled to any further compensation for the Egyptian sale. In order to succeed he would have to be able to show that costs are not costs, that a plant that is not now and likely never will be completed is complete, and that a necessary expense of completing a sale is in reality a "capital expenditure". We decline to subject defendant and the judicial system to the burden of such a futile quest.

Affirmed. Chemtex's request for sanctions is denied.

OAKES, Circuit Judge (dissenting):

I respectfully dissent.

The appellant's brief in places seems to rely solely on the proposition that because Chemtex had a 36.67% equity in the Egyptian corporation that built the paint plant, its accounting [1] necessarily was erroneous and the expenses nondeductible. Understandably, then, the majority has been led into the same trap that I believe the district

1.

| EGYPTIAN PAINT PROJECT PRETAX PROFITS | | |
|---|---|---|
| | CHEMTEX | CHEMTEX (AUSTRIA) |
| CONTRACT REVENUES | $5,000,000.00 | A.S. 89,250,000 |
| PROJECT COSTS | | |
| Chemtex Labor | $222,425.69 | A.S. |
| Outside Labor and Consulting | 1,144,909.70 | 564,845 |
| Material (Equipment) | 1,205,066.60 | 50,992,401[= $3,436,145] |
| Freight Packing and Insurance | 243,222.45 | 1,661,891 |
| Blueprints | 11,565.81 | |
| Telephone and Telex | 1,067.33 | 65,564 |
| Travel and Related Expenses | 440,252.48 | 672,800 |
| Commissions | 470,000.00 | 10,995,820 |
| License and Know-How | 190,000.00 | |

| | CHEMTEX | CHEMTEX (AUSTRIA) |
|---|---|---|
| Bank Charges | 33,262.82 | 1,351,339 |
| Project Execution Overhead | 218,995.28 | |
| AWT Fee | | 1,723,400 |
| Chemtex (Austria) Expenses | | 719,624 |
| Equity or "Selling Expense" | 1,950,453.31 | |
| Administrative Overhead | 972,854.00 | |
| PROJECT COSTS | $7,104,078.10 | A.S. 68,747,684 |
| | | A.S. 20,502,316 |
| NET REVENUES | $(2,104,078.10) | $1,381,558* |
| TOTAL PRETAX PROFIT OR LOSS | | $(722,520.10) |

* Austrian Schillings converted to dollars at a rate of A.S. 14.84=1.00, which was the rate reported in the *Wall Street Journal* on July 31, 1986 for July 30, 1986.

court fell into: taking appellant's real argument to be that the phrase "pre-tax profits" in the Chemtex-Pashman employment agreement means gross revenues or price of the project, as Pashman testified on deposition. It is obvious that this cannot be correct and that pretax profits means revenues less appropriate costs. A careful reading of the record, however—and especially the deposition of Joseph Bainton, who negotiated the employment agreement on behalf of Chemtex, and of the affidavit of George J. Isaacs, a New York and New Jersey C.P.A.—convinces me that there are genuine issues of fact concerning whether Pashman now, or at some time in the future, may be entitled to further compensation. There are several cost items in the accounting submitted by Chemtex that Isaacs questions and that need to be further substantiated before their deduction should be permitted in arriving at a figure for pretax profits. To be sure, Isaacs questions all the costs for lack of an audit trail, i.e., supporting schedules, original bills of materials, invoices or pertinent source document references. But even absent these questions, I see specific questionable items, not resolvable at this time.

The first item I would question is the item of $470,000 for "Commissions." While $120,000 is said to have been paid to Indconsult, $350,000 is "estimated" as an obligation to one Nakhleh in connection with his 5% "finders fee" on "equipment" supplied by Chemtex and "raw materials" to be supplied by Chemtex to the Project following the plant's completion. It would seem that so much of the "finder's fee"— we do not know what Nakhleh "found"—as depends on raw materials *to be* supplied is irrelevant to the calculation of the profits on the plant proper. As to equipment expenses, the Chemtex affidavits simply estimate the cost of equipment to be supplied by Chemtex and Chemtex Austria at $7 million. But the accounting itself, note 1 *supra,* shows $1,205,066 equipment costs to Chemtex and $3,436,145 costs to Chemtex Austria, i.e., $4,641,211. It may well be that as the affidavits suggest "certain of the equipment has not yet been supplied."

But how do we know how much remains to be provided?

The next item I would question is, of course, the $1,950,453 item for "Equity or 'Selling Expense.'" While it may be that "[i]t is a regular practice of Chemtex to invest capital or equity on a project as a marketing tool," the fact is that Chemtex does have an equity and that equity does have a value. While Chemtex says that "when a project is completed, Chemtex values that equity investment at anywhere from zero to 50 percent of the actual amount of the investment, and records that amount as an expense attributable to the project," this cannot be in accordance with appropriate accounting procedures—C.P.A. Isaacs says the practice "represents a peculiar distortion of accounting terminology." At best the writeoff of the equity is at this point premature and at worst it suggests the whole project is a bad one. Moreover, according to Bainton, "we all thought in the Egyptian paint thing, it would have residual value, though God knows what it would be." It would seem to me that the burden is on Chemtex to show justification for writing off any portion of the equity investment at this time. Interestingly, Chemtex would have it both ways because it asserts that it has paid Nakhleh's commission in the sum of $178,-630.62 by giving him equity in the Egyptian Paint Co. in the amount of $141,168.12 plus $37,462.50 in cost overruns.

The next item I would question is "Administrative Overhead," amounting to $972,854. According to Bainton it was never intended to charge administrative—as opposed to project—overhead to the plant project. As he said,

I can also tell you the reason that we did it without the Chemtex overhead is that in one year, the kind of business that Chemtex is, we could sell a lot of plants in one year and end up that the overhead attributable to any one project was negligible, or we could sell only one project in a year and all of the overhead could land on that; and that was the reason for always calculating these things on a stand-alone basis and not putting the general overhead in it.

Nor has there been established a basis for such a charge.

Just the omission from costs of the last two items, "Equity or 'Selling Expense'" and "Administrative Overhead," would show Chemtex's net profits to be $2,200,-787 as to which Pashman would be entitled to a $220,078 commission as opposed to the $162,750 he has so far been paid. Concededly, Chemtex argues that Pashman is presently entitled only to 50% of his commission since the paint plant has not yet been accepted by the customer. This may mean that the present action is premature or at least should be held in abeyance pending acceptance; but there at least seem to me to be sufficient factual issues to warrant denial of summary judgment. The Isaacs affidavit also questions several other items, for example project costs and expenses incurred by and chargeable to Egyptian Paint Co.; charging a $50,000 commission to one Khalil as an expense rather than as a capital expenditure where the payment was made from a $960,000 saving by "the substitution of Cook Paint for Dupont Technology"; and bank charges for letters of credit properly allocable to Egyptian Paint Co. These matters—which seem to me plausible—I would leave for trial.

Repeating, while Pashman and his counsel seemed to proceed on a theory that permits them to be blown out of the water, I would keep them afloat because the financial summary used by Chemtex to show no commission due is facially insufficient to show that nothing is due Pashman under the employment agreement. Accordingly, I respectfully dissent.