**OVERSEAS DEVELOPMENT DISC CORP., Plaintiff and Intervening Cross–Defendant–Appellee,**

**and**

**Universal Development Corp., Intervening Plaintiff and Intervening Cross–Plaintiff–Appellant, Cross–Appellee,**

**v.**

**SANGAMO CONSTRUCTION CO., INC., Defendant–Appellee, Cross–Appellant.**

**Nos. 85–2902, 85–3031.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 14, 1987.

Decided Feb. 12, 1988.

Gary Green, Sidkoff, Pincus & Green, Philadelphia, Pa., John F. Bomster, Adler Pollock & Sheehan, Inc., Providence, R.I., for Overseas Development Disc Corp. and Universal Development Corp.

Jerold S. Solovy, Jenner & Block, Chicago, Ill., Barry Levenstam, for Sangamo Const. Co. Inc.

Before WOOD, COFFEY and MANION, Circuit Judges.

MANION, Circuit Judge.

This diversity action presents elaborate facts centered about three businessmen trying to build roads in Arab countries. But after more than ten years of litigation, including a prior opinion by this court, the only legal question which remains is the arcane one of interpreting *quantum meruit* under Kuwaiti law.

The fifty-three-page opinion below which gives rise to this appeal is unpublished. *Overseas Dev. Disc Corp. v. Sangamo Constr. Co.*, No. 84–1005 (C.D.Ill. Oct. 21, 1985) ("*Overseas III*"). Because of its length, we do not attach a copy of the district court's opinion as an appendix. We inform the parties that we find each of the district court's findings of fact to be not clearly erroneous, see Fed.R.Civ.P. 52(a), and we adopt and affirm those findings in full. We also adopt and affirm its conclusions of law and judgment, except where noted below. We shall refer to the district court's opinion as necessary to clarify the following discussion.

I.

Sangamo Construction Co., Inc. ("Sangamo"), a construction company which primarily builds roads, is incorporated in Delaware with its principal place of business in Illinois. In 1974, Sangamo decided to explore opportunities in Arab countries. Allen Reyhan is Sangamo's president.

To assist him in Saudi Arabia and Kuwait, Reyhan was introduced by a mutual friend to Attila Turkkan, the president of Overseas Development Disc Corp. ("Overseas"), a budding international business broker. Overseas is incorporated in New York and has its principal place of business there. Its primary business is selling steel.

From August, 1974 until October, 1975, Overseas employed Taj Farouki full-time as one of its representatives in the Middle East. Farouki, who was born in what was then commonly referred to as Palestine, has been an Illinois citizen since 1952. He is fluent in Arabic and English and knows the business culture of the Middle East.

In June, 1975, Turkkan asked Farouki to call on Sangamo to interest Sangamo in doing business in the Middle East. Farouki met with Reyhan. Several weeks later, Farouki and Reyhan met again and specifically discussed a project known as the Kuwait Motorway Project. *Overseas III*, Finding of Fact No. 68. In November, 1975, Reyhan appointed Farouki the "official representative" of Sangamo and granted him "the authority to negotiate with the government of Kuwait on behalf of Sangamo." *Overseas III*, Finding of Fact No. 87.

After October, 1975, the relationship between Overseas and Farouki became decidedly more ambiguous. Farouki formed his own company, Universal Development Corp. ("Universal"). Universal is incorporated under the laws of the Grand Cayman, British West Indies, and has its principal place of business in New Jersey. Farouki became Universal's vice-president on January 1, 1976. But he remained with Overseas on a project-to-project basis; while working for Universal, he remained affiliated with Overseas, particularly to assist Sangamo. Overseas and Farouki shall collectively be referred to as "the Finders."

In January, 1976, Overseas introduced Reyhan to Nabil Sharif, the Chief Engineer of Burhan Trading and Contracting Company ("Burhan Trading Company"), a Kuwaiti engineering concern. Reyhan discussed with Sharif the possibility of Burhan Trading Company serving as the local agent, partner, subcontractor or joint venturer with Sangamo in Kuwait. *Overseas III*, Finding of Fact No. 98.

A year and one-half later, in July, 1977, Kuwait awarded Sangamo a contract for $63,191,000 ("the project amount") to build a highway on a project known as Phase I of the Kuwait Motorway Project. Sangamo had submitted the lowest bid. Burhan Trading Company would serve as Sangamo's local agent for the project as well as a subcontractor.

The parties still dispute how much of Sangamo's success in receiving the contract is attributable to the Finders. What is not disputed is that Sangamo won the Kuwait Motorway Project contract without

having ever entered into a written agreement with Overseas or Farouki regarding any commission or fee Sangamo would pay should it receive a contract, though Reyhan had discussed that issue often with Turkkan and Farouki, as had Turkkan and Farouki between themselves.

## II.

Overseas filed its complaint first. Then Universal, to whom Farouki had assigned his rights, intervened to file a complaint against Sangamo and a cross-claim against Overseas. Jurisdiction was proper pursuant to 28 U.S.C. § 1332, diversity of citizenship.

The Finders' complaints against Sangamo seeking a commission were based upon express contract and alternatively in *quantum meruit* for the reasonable value of their services. For example, Count II of Overseas' complaint sought in *quantum meruit* 3 percent of the project amount in the event that the court failed to find Overseas entitled to recover on the oral contract set forth in Count I. Three percent of the project amount of $63,191,000 equals $1,895,730. Count II of intervening plaintiff Universal's complaint against Sangamo similarly demanded 5 percent of the project amount *directly* from Sangamo. Universal predicated its claim on an implied contract between Sangamo on the one hand and Farouki "and/or" an Overseas–Farouki joint venture on the other. Universal also sought to recover from Sangamo in *quantum meruit.*

Universal's cross-claim against Overseas claimed that, as the assignee of Farouki's rights, it was entitled to half of any commission received by Overseas from Sangamo. Universal predicated its claim on an alleged joint venture agreement between Farouki and Overseas and in the alternative on the basis of "quantum meruit, quasi-contract and theories of estoppel." The district court (both the first time and on remand) reasonably read this part of Universal's cross-claim (Count V of Universal's complaint) as seeking only a declaratory judgment as to its (Farouki's) rights against Overseas. Paragraph 49 of the

cross-claim in its entirety emphatically demanded that "[a]s a result of the dispute between Plaintiff [Overseas] and Intervenor [Universal], the rights and liabilities of the parties should be resolved by a declaratory judgment."

Universal further alleged in its cross-claim that Overseas negligently failed to obtain a written agreement from Sangamo for a 2 percent commission. On its negligence claim, Universal prayed for money damages against Overseas in the event that the court should find Sangamo was not obligated to pay to the Finders a commission equal to at least 2 percent of the project amount.

After a bench trial, the district court found for Overseas against Sangamo on a contract for 1.25 percent of the project amount (= $789,887) and—in the alternative—for Overseas against Sangamo in *quantum meruit* for 1 percent of the project amount (= $631,910). *Overseas Dev. Disc Corp. v. Sangamo Constr. Co.,* 502 F.Supp. 1256, 1266 (C.D.Ill.1980) (*Overseas I*). The court based its *quantum meruit* award solely upon expert testimony that the normal rate for brokerage services in circumstances like these was 1 to 5 percent of the contract price: "The credible evidence required a finding that a range of 1 to 5 percent of gross would customarily apply to a construction contract, which thus renders a rate of 1 percent as a measure of recovery." *Id.*

The district court further denied Universal's cross-claim against Overseas on the grounds that Farouki could not assign to Universal his rights against Overseas. While the court found that otherwise Farouki would have been entitled to 30 percent of Overseas' commission from Sangamo, it found for Overseas as against Universal because Farouki was not a party to the action. *Id.*

## III.

On appeal, this court affirmed in part and reversed in part. *Overseas Dev. Disc Corp. v. Sangamo Constr. Co.,* 686 F.2d 498 (7th Cir.1982) (*Overseas II*). We first

held that Farouki validly assigned his rights to Universal. 686 F.2d at 504–05. We then held that no contract existed between Overseas and Sangamo. 686 F.2d at 505–08. Sangamo had not agreed to pay the Finders for their services; instead, Sangamo had rejected every request the Finders made.

We also reversed the district court's alternative conclusion that the Finders were entitled to recover 1 percent of the project value in *quantum meruit.* While finding that there existed "no real dispute about the validity of Overseas' *quantum meruit* claim under any law that might be applied," 686 F.2d at 508, we found "difficulty with the *quantum meruit* claim ... in the measure of damages ... [because] the district court erred in giving conclusive weight to the expert testimony." 686 F.2d at 509. The district court erred in relying solely on testimony about custom and usage from business practice experts. 686 F.2d at 506 n. 22, 509. We therefore remanded this specific issue:

> [T]he court must hear evidence on the *quantum meruit* claim. In order to decide how much money Overseas should receive in restitution, the court should permit the parties to explore in some detail exactly what services were performed, how much they cost, and what benefit inured to Sangamo from them....

686 F.2d at 510.

We also directed the district court "to determine the nature of the Farouki–Overseas relationship, because that in turn will establish what [Universal] is entitled to receive and from whom." *Id.*

### IV.

Following a second bench trial, the district court issued its unpublished opinion and judgment (*Overseas III*). The court first established that Article 180 of Kuwait Law of Commerce No. 2 of 1961, which can best be thought of as the Kuwaiti *quantum meruit* provision, governed both the claims of Overseas against Sangamo and those of Farouki against Overseas.

The court then found that the market value of the services rendered by Overseas (including Farouki) equaled ¾ of 1 percent of the Kuwait Motorway Project award. This amount equals, tracking the language of Article 180, the loss the Finders sustained and is less than the benefit received by Sangamo. The court reasoned that the market value of the services rendered to Sangamo by the Finders would customarily fall within a range of 1 percent to 2 percent of the value of the Kuwait Motorway Project. But Overseas' inexperience, its limited knowledge of construction, and the assistance Sangamo reciprocally rendered to Overseas in developing Overseas' fledgling business all mitigated towards reducing the *quantum meruit* recovery to ¾ of 1 percent of the project value, which equals $472,500.

In determining the nature of the Farouki–Overseas relationship, the court declared that Farouki—in light of how he and Overseas divided responsibilities between themselves—earned one-half of Overseas' commission. But the district court then invoked Kuwaiti equitable powers under Article 180 to insure that Farouki would pay for and not be unjustly enriched by a benefit Overseas conferred upon itself and Farouki together:

> 27. Because the quantum meruit claim against Sangamo flowed directly to [Overseas], [Overseas] was faced with the prospect of, and in fact obligated itself to pay, attorney fees and costs of collection to procure collection of the commission from Sangamo, from which Farouki's right to payment was derived. Under Article 180, therefore, Farouki is entitled to receive from [Overseas] 50 percent of the net commission received from Sangamo, after deducting from the gross commission payable [Overseas'] attorneys fees and costs of collection.

*Overseas III*, Conclusion of Law No. 27. By awarding Farouki half of Overseas' net commission, which equals the gross commission Overseas will receive from Sangamo, minus Overseas' attorney's fees and collection costs, the district court properly treated the gross commission as a common fund. As in a class or derivative action

under the securities acts, the court recognized that Overseas incurred legal and collection expenses in winning the gross commission—the fund—for Farouki's benefit as well. "[W]hen such a fund is for all practical purposes created for the benefit of others, the formalities of the litigation ... hardly touch the power of equity in doing justice as between a party and the beneficiaries of his litigation." *Sprague v. Ticonic Nat'l Bank,* 307 U.S. 161, 167, 59 S.Ct. 777, 780, 83 L.Ed. 1184 (1939). The court simply awarded to Overseas a portion of the "gross commission" as "costs as between solicitor and client," *Trustees v. Greenough,* 105 U.S. (15 Otto) 527, 533, 26 L.Ed. 1157 (1882), with Farouki the client and Overseas (and its attorneys) the solicitor. *See Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 389–97, 90 S.Ct. 616, 624–28, 24 L.Ed.2d 593 (1970); *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980) ("a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."). By awarding only Overseas its attorney's fees and collection costs from the common fund, the district court denied (implicitly) Universal's claim for its attorney's fees and costs in collecting that same gross commission.

The court concluded that Sangamo was obligated to pay Overseas, with whom it had dealt directly, and that Overseas was in turn obligated to pay half its net proceeds to Universal for the services Farouki performed for Overseas. The court also held that Overseas was not negligent and did not breach any fiduciary duty to Farouki in not obtaining a written commission agreement from Sangamo.

## V.

Sangamo and Universal timely appealed from certain parts of the decision below. The district court fixed Sangamo's liability as against the Finders, and that is the decision from which Sangamo and Universal appeal. Technically, Sangamo appeals from the district court's judgment in favor of Overseas and against Sangamo on Count II of Overseas' complaint, while Universal appeals from the district court's judgment in favor of Sangamo and against Universal on Count II of its intervening complaint against Sangamo seeking *direct* recovery in *quantum meruit.* Universal also appeals from the district court's failure to deduct its attorney's fees and collection costs from the gross commission to be split with Overseas. Universal further appeals from the district court's denial of its negligence claim against Overseas.

■ The district court did not determine the amount of attorney's fees and other costs Overseas incurred in collecting the commission from Sangamo (which commission Overseas has yet to receive). But even before *White v. New Hampshire Dep't of Employment Sec.,* 455 U.S. 445, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982), and its progeny, *see, e.g., Exchange Nat'l Bank v. Daniels,* 763 F.2d 286, 291–92, *modified on other grounds,* 768 F.2d 140 (7th Cir. 1985), it was settled that a decision awarding or denying attorney's fees and expenses from a common fund (as opposed to from an adverse party) is severable from the decision on the merits and separately appealable. *Boeing Co. v. Van Gemert, supra,* 444 U.S. 472, 479 n. 5, 100 S.Ct. 745, 750 n. 5, 62 L.Ed.2d 676 (1980); *Swanson v. American Consumer Indus., Inc.,* 517 F.2d 555, 559–61 (7th Cir.1975); *Trustees v. Greenough, supra,* 105 U.S. (15 Otto) 527, 531, 26 L.Ed. 1157 (1882). *See also* 7C C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil 2d* § 1841 (2d ed. 1986); *Boeing, supra,* 444 U.S. at 485, 100 S.Ct. at 752–53 (Rehnquist, J., dissenting). Jurisdiction on appeal is therefore proper pursuant to 28 U.S.C. § 1291.

## VI.

■ To determine foreign law, a district court may look to any relevant source, including expert testimony. *United States v. Peterson,* 812 F.2d 486, 490 (9th Cir. 1987). On appeal, we treat the district court's determination of foreign law "as a ruling on a question of law." Fed.R.Civ.P. 44.1. "Our recognition of foreign law as law, rather than as fact, allows us to re-

view the district court's interpretation and application of such law and the rights and duties bestowed upon the parties." *Randall v. Arabian Am. Oil Co.*, 778 F.2d 1146, 1151 n. 4 (5th Cir.1985).

We have already found that there is "no real dispute about the validity of Overseas' *quantum meruit* claim under any law that might be applied." *Overseas II*, 686 F.2d at 508. Our mandate to the district court was for it to determine the amount of *quantum meruit* damages. *Quantum meruit*, which means "as much as he deserves," *Edens View Realty & Inv., Inc. v. Heritage Enter., Inc.*, 87 Ill.App.3d 480, 42 Ill.Dec. 360, 366, 408 N.E.2d 1069, 1075 (1980), is the recovery on the quasi-contract *implied by law* in those situations where it would be unjust for one who receives a benefit not to pay for it. *Id.* A *quantum meruit* recovery prevents unjust enrichment. "Generally, in order to recover on a quasi-contractual claim, the plaintiff must show that the defendant was unjustly enriched at the plaintiff's expense, and that the circumstances were such that in good conscience the defendant should make restitution." *Lirtzman v. Fuqua Industries, Inc.*, 677 F.2d 548, 553 (7th Cir.1982) (applying Illinois law) (quoting *Bloomgarden v. Coyer*, 479 F.2d 201, 211 (D.C.Cir.1973)). *Accord Overseas II*, 686 F.2d at 510–11. *See Minyard v. Curtis Products, Inc.*, 251 La. 624, 205 So.2d 422, 432 (1967) (outlining similar prerequisites for the analogous civil law concept of a suit by *action de in rem verso* ).

As between the Finders and Sangamo, the parties agree on appeal that Article 180 in the Law of Commerce No. 2 of 1961 tells how to measure damages. Article 180, the Kuwaiti civil law version of traditional common law *quantum meruit*, remedies what its title labels "Unjust Enrichment."[1] Article 180 provides in pertinent part as follows:

Any person ... who enriches himself at the expense of another person but without a legitimate cause shall, within the limits of the enrichment he acquired, indemnify that person for the loss he has suffered.

The district court, after considering expert testimony, correctly concluded that under Article 180, the enriching party may recover from the enriched party the lesser of the benefit conferred on the enriched party or the loss suffered by the enriching party. The loss suffered by a person rendering professional services, in turn, is the *market value* of those services. *Overseas III*, Conclusions of Law 10–11.

Sangamo's own legal expert, Prof. Bassiouni of DePaul University, testified that the term "loss" as used in Article 180 "includes two elements: the first element being the specific out-of-pocket expenses, and the second would be the equivalent remuneration for the types of services performed." Prof. Bassiouni quoted with approval from a book in Arabic by the eminent jurist Dr. Sanhouri, who apparently drafted Article 180. Reading from the third edition of Dr. Sanhouri's book *Treatise on Civil Law, Volume 1* published by the Cairo University Press in 1981, Prof Bassiouni translated and quoted Dr. Sanhouri for the proposition that "if the person who suffered the improverishment ... is a professional, such as an attorney ... or a broker, then the determination of the loss is on the basis of the commercial value of the services or the work performed."

■ We are satisfied that in looking to market value the district court correctly interpreted and applied Kuwaiti law. See Fed.R.Civ.P. 44.1. "In fact, the reasonable market value of plaintiff's services can be viewed as the correct remedy in most quantum meruit cases, even in many cases in unjust enrichment because reasonable value can be viewed as the defendant's gain.... The value of the plaintiff's services measures the defendant's gain when the defendant requests the work: the defendant's benefit is receiving what he or she requested. Those requested services have a market value." Candace Kovacic, *A*

---

1. In citing to Kuwaiti statutes, we rely upon the translations found in *Business Laws of Kuwait* (G. Sfeir & O. Zlam ed.,) a work which has been found to be complete and accurate by the Kuwait Minister of Justice.

*Proposal to Simplify Quantum Meruit Litigation,* 35 Am.U.L.Rev. 547, 557 (1986).

## VII.

The dispute between the Finders and Sangamo centers around the district court's conclusion that before discounting for certain mitigating factors,

13. The market value of the services rendered by [Overseas] to Sangamo fall within the range of one to two percent of the Kuwait Motorway Contract, *to wit* a range of $631,910 to $1,263,820.

Like a typical successful principal, see, e.g., *E.L. Klewicki Co. v. American Screw Prod.,* 690 F.2d 85, 87 (6th Cir.1982) (per curiam), Sangamo would like to limit the cost of the Finders' services to their proven expenses, and at most to an hourly rate. But "the standard for measuring the reasonable value of the services rendered is the amount for which such services could have been purchased from one in the plaintiff's position at the time and place the services were rendered." *Blanton v. Friedberg,* 819 F.2d 489, 493 (4th Cir.1987) (quoting *United States v. Algernon Blair, Inc.,* 479 F.2d 638, 641 (4th Cir.1973) (citations and footnotes omitted)).

In *Edens View Realty & Inv., Inc. v. Heritage Enter., Inc., supra,* 87 Ill.App.3d 480, 42 Ill.Dec. 360, 408 N.E.2d 1069 (1980), the plaintiff broker, fulfilling the terms of an *invalid* written agreement, placed several telephone calls which resulted in the sale of a nursing home owned by the defendant. The court held that the broker could recover his full commission on a *quantum meruit* claim. The court stated that the evidence showed that the normal commission in similar sales ranged from 5 to 10 percent and affirmed an award to the broker of a 5 percent commission. *See also Nardi & Co. v. Allabastro,* 20 Ill. App.3d 323, 314 N.E.2d 367 (1974).

Our earlier opinion accepted the district court's first analysis that Overseas could have purchased the services of a business broker or finder only by offering a percentage commission of the project amount. But we remanded this matter to the court for additional fact-finding as to whether the services performed by the Finders here justify the customary and usual rate:

We agree that the record is inadequate and that the district court erred in giving conclusive weight to the expert testimony. The court apparently confused implied-in-fact contracts, whose missing terms can be supplied by custom and usage, with implied-in-law contracts, which are not contracts at all, but devices to prevent unjust enrichment.

*Overseas II,* 686 F.2d at 509 (footnote omitted).

We did not forbid awarding a percentage commission as *quantum meruit* recovery, but rather sought to distinguish between relying upon custom and usage as determinative and employing custom and usage as a factor in measuring market value. The Finders' expert, Arnold Lessard, testified that the Kuwaiti construction industry sets percentage compensation based upon "the services [to be] rendered, how you are perceived as an effective individual in that particular marketplace and the reasonable possibility you have of bringing bona fide opportunities." As Sangamo correctly argues, "[a]lthough custom and usage is one of the factors that may be considered in calculating 'market value,' it is by no means determinative. A court must also evaluate transaction-specific factors...." On remand, that is exactly what the district court did.

The district court satisfied this court's mandate. The first time around, the district court relied conclusively on expert testimony about the customary commission to set the commission here. This time, the court evaluated transaction-specific factors, concluded that the services rendered here were less valuable than the customary and usual, and invoked those factors to reduce the commission awarded from 1 percent to ¾ of 1 percent. The court discounted the rate because Overseas was new in the field and did not have experience in construction, and because Sangamo in effect bartered for a certain portion of Overseas' services by helping Overseas on certain matters. While Sangamo argues on appeal that the services the Finders provided were

all done in return for those they received from Sangamo, the district court did not clearly err in rejecting that factual contention. We have already held that "Overseas intended to render services for compensation; Sangamo contemplated paying something for those services...." *Overseas II*, 686 F.2d at 508.

■ In response to our directive in *Overseas II* "to explore in some detail exactly what services were performed," 686 F.2d at 510, the district court found that the instrumental services that Overseas and Farouki performed for Sangamo included:

(a) Providing Sangamo with an introduction to the market and business customs of the Middle East as well as locating and identifying opportunities for it in Kuwait, including the Kuwait Motorway Project;

(b) Providing Sangamo with sufficient information to enable it to determine whether it wanted to bid for a project in the Middle East, and that from the various opportunities available to it in several Middle East countries, it would bid on the Kuwait Motorway Project;

(c) Helping Sangamo deal with unfamiliar bureaucratic procedures for bidding on the Kuwait Motorway Project;

(d) Acting as liaison between Sangamo and Burhan Kuwait Trading and Contracting Company, which served as Sangamo's national agent in Kuwait and was a major subcontractor of Sangamo in connection with the Kuwait Motorway Project and other projects;

(e) Preparing and filing prequalification documents for Sangamo for the Kuwait Motorway Project prior to the deadline for filing those documents, when the documents Sangamo had forwarded to the Government of Kuwait were not received timely;

(f) Providing advice and information as needed or requested by Sangamo concerning the Kuwait Motorway Project, local Kuwait customs and methods of doing business in Kuwait;

(g) Acting as interpreter in discussions with Arab-speaking persons in Kuwait

with whom Sangamo transacted business relative to the Kuwait Motorway Project;

(h) Attending meetings in Kuwait as Sangamo's representative in connection with the Kuwait Motorway Project, and reporting matters of interest and importance to Sangamo relative to that project;

(i) Receiving and sending telexes for Sangamo and generally facilitating communications for and on behalf of Sangamo;

(j) Facilitating Sangamo's entry into and exploration of the Middle East market (and Kuwait in particular) by arranging for hotel accommodations, visas, transportation and other similar matters; and

(k) Performing public relations and promotional activities on behalf of Sangamo thus helping Sangamo to be viewed favorably by Kuwaiti Governmental officials, Burhan, and others in Kuwait.

*Overseas III*, Finding of Fact No. 156. The district court concluded that the services rendered by the Finders "enriched" Sangamo within the meaning of Article 180. *Overseas III*, Conclusions of Law Nos. 5, 14. Translated into Illinois terminology, this means that the Finders were the proximate or procuring cause of Sangamo's landing the project, *see generally Edens View Realty & Inv., Inc. v. Heritage Enter., supra,* 87 Ill.App.3d 480, 42 Ill.Dec. 360, 365, 408 N.E.2d 1069, 1074 (1980), though under the " 'rules of the game' " in international trade and market identification, a finder "may also be entitled to commissions in the event the client obtains any business as a result of the efforts of the finder...." *Overseas III*, Finding of Fact No. 40.

Sangamo protests that it obtained the project through its own efforts. For example, Sangamo states on appeal that "Plaintiffs did not introduce Sangamo to [Burhan Trading Company]." Yet Exhibit 331 below was a letter dated April 5, 1977 from Reyhan to the R.B. Potashnick Construction Co. in Cape Girardeau, Missouri, a partner of Sangamo's. In it, Reyhan describes and credits Farouki as "the man who introduced me to [Burhan Trading

Company] last year and has helped us to get pre-qualified when the job was advertised for bids last year." *Overseas III*, Finding of Fact No. 149. In November, 1976, Reyhan wrote to Sharif at Burhan Trading Company and—in the course of suggesting that Overseas be compensated —acknowledged that Sangamo and Burhan Trading Company had met through Overseas. *Overseas III*, Finding of Fact No. 128.

Despite Sangamo's attempt to retry the case on appeal, we are not " 'left with the definite and firm conviction that a mistake has been committed.' " *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). The district court did not clearly err in how it evaluated the efforts the Finders made, the quality of those efforts, and the importance of the Finders' efforts to Sangamo's successful bid for the project.

Sangamo points out in its brief that its president Reyhan testified at the second trial that in a meeting with Turkkan in December 1976, Turkkan valued Overseas' services at between $100,000 to $125,000. Yet according to Reyhan's own testimony, this was momentarily after Reyhan had rejected Turkkan's previous valuation that day of $500,000 to $600,000. Furthermore, by this time the Finders' efforts were well under way, and the Finders realized that their bargaining position was rapidly decreasing. Turkkan's figures were settlement proposals, not ripe appraisals of market value. Similarly, Sangamo submits that a "contemporaneous" invoice from Farouki placed an upper limit of $20,000 on the value of the Finders' services. That invoice was mailed on April 15, 1976 by Farouki in Kuwait, where he and his family were living, to Reyhan in Springfield, Illinois:

In his April 15, 1976 "invoice covering time and expense spent on various Sangamo assignments," Taj Farouki valued his own services at a rate of $25 per hour. The invoice, for 210 hours from August 1, 1975 through April 5, 1976,

covered all of Farouki's work on the Kuwait Motorway Project through the date of the invoice.

*Overseas III*, Finding of Fact No. 121. Farouki listed his "out-of-pocket expense" from August 1, 1975 to April 5, 1976 as $1,420. By doubling the amounts listed in the invoice to account for the time between the invoice and its successful bid, Sangamo arrives at an upper bound of $20,000. But by April 15, 1976, as the district court's findings show, Farouki was hungry and desperate. He was paid little by Overseas, and his bargaining position—after Reyhan had already made two trips to the Middle East—was fast eroding. Farouki's invoice, while admissible, is not by itself conclusive evidence of the market value of his services.

A percentage commission, not an hourly rate, is how the market measures a business broker's value. *Overseas III*, Findings of Fact Nos. 178–80. The precise number of hours the Finders worked is relevant evidence of the services they actually rendered for Sangamo. *See Overseas II*, 686 F.2d at 509; *Blanton, supra*, 819 F.2d at 493. Similarly, the Finders' expenses in working for Sangamo also reflect precisely what they did. As the district court found, the Finders did not introduce specific evidence in the second trial about the hours they worked or their expenses. But it is not surprising that the Finders cannot document that. In their supplementary answers to Sangamo's second set of interrogatories, Overseas stated that "[e]xpenses are not generally allocated with respect to the amounts incurred in rendering services to a particular client." This makes sense. Accounting takes time and money, and would be wasteful where the market compensates based upon a percentage of a successful bid. If the Finders, citing to the hours they put in and their expenses, were to claim an amount greater than the market percentage rate as the loss they have suffered within the meaning of Article 180, then their failure to prove their hours worked and expenses would be harmful.

In addition, the percentage of ¾ of 1 percent that the district court set is supported by the nature of an award in *quantum meruit*, which is equitable and subject to equitable considerations. The district judge sat as a Kuwaiti chancellor in equity. *Cf. E.L. Klewicki, supra*, 690 F.2d at 87. In *Overseas II*, we determined that a *quantum meruit* recovery would be appropriate. We remanded to the district court to determine how much, and gave some directions how to do it. "How much is reasonable in any particular case is a question of fact, not one of law. There is no rule of law by which the amount can be deductively determined." *E.L. Klewicki*, 690 F.2d at 87–88 (citing 1 *Corbin on Contracts*, § 99 at 445).

Sangamo urges that the district court erred as a matter of law in concluding that the market value of the Finders' services equaled the market value of experienced and skilled market representatives. But that is not what the district court found. The court found that the Finders were "new entrants into the so-called 'market identification and representation' field in Kuwait" and had had no prior experience in construction or in Kuwait. *Overseas III*, Finding of Fact No. 163. As we recognized in *Overseas II*, "[n]othing suggests that every new entrant in the field could command the going rate." 686 F.2d at 506 n. 22. But as stated by Omar Najeeb, a Chicago lawyer qualified as an expert in Kuwaiti law, "[o]f paramount importance [to a Kuwaiti court] would be the accomplishment of the task that was performed...."

The Finders might have earned a percentage commission if they had expended the efforts they expended for Sangamo on someone else. A market value commission compensates the Finders not only for the actual time and money they advanced but also for the risk they incurred that Sangamo would not win any business in Kuwait despite their efforts. If Sangamo did not garner the job, then the Finders would receive nothing. And an influence peddler can only go to the well so many times. The favors the Finders requested and the chips they called in on behalf of Sangamo were exhausted, and could not be used for somebody else.

A business broker is unlike a home painter, whose services are for the most part fungible and can be measured by the hours worked and the paint splashed. When a company hires a business broker, it is buying influence and access, and that can not be measured by the minutes expended, but rather by knowing where to spend those minutes and with whom. Because there is no certain way to measure influence and access, the construction market adopts a percentage of the project as the most reliable measure and the one that provides the right incentives to the brokers at the right price to their clients.

At the time that Sangamo engaged Overseas, American contractors believed that they absolutely needed native (never mind that both Turkkan and Farouki are Americans) middlemen to tap into what was then the cascading Arab oil wealth. Potential middlemen knew this and took advantage of it. If Sangamo would not have chosen Overseas, it would have chosen some other firm to represent it (perhaps one that would have finished negotiating the commission before beginning work). Sangamo's pleadings reflect its present belief that it could have done as well without using a business broker and market identification expert. But the Finders are entitled in *quantum meruit* to the market value of their services at the time, not what chastened (and less greedy) American contractors would pay today.

Ultimately, after granting Kuwait concessions on extras and liquidated damages, Sangamo earned a profit of only $325,000, which is almost $150,000 less than the judgment entered against it. But as we stated in *Overseas II*, "Sangamo could not use its narrow profit margin on the completed project to limit Overseas' recovery. Cost overruns, delays, and events unforeseen at the time Overseas was employed were risks to be borne by the contractor, not the broker." 686 F.2d at 509–10.

The district court did a fine job of hearing and resolving frequently conflicting

testimony. No party will be heard to complain that the ¾ of 1 percent commission is not equitable and reasonable.

## VIII.

█ The district court's remaining mandate was "to determine the nature of the Farouki–Overseas relationship, because that will in turn establish what [Universal] is entitled to receive and from whom." *Overseas II*, 686 F.2d at 510. After the first bench trial, the district court found "no credible evidence to support a conclusion that a joint venture did exist...." *Overseas I*, 502 F.Supp. at 1266. Rather, the court then found that Farouki had a personal service contract with Overseas. *Id.* On appeal, we emphasized in remanding that "[w]e do not necessarily disagree with the district court's factual findings that the relationship was an employment contract...." *Overseas II*, 686 F.2d at 510.

This time around, the district court concluded that "[u]nder Kuwait law the legal relationship that existed between [Overseas] and Farouki can best be described as a contractual relationship, which cannot be specifically identified or characterized." *Overseas III*, Conclusion of Law No. 18. This suggests that an *implied-in-fact* contract, not an implied-in-law quasi-contract, existed. " 'An implied-in-fact contract is a true contract, containing all necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt.' " *Lirtzman v. Fuqua Industries, supra*, 677 F.2d 548, 551 (7th Cir.1982) (applying Illinois law) (quoting *Bloomgarden v. Coyer*, 479 F.2d 201, 208 (D.C.Cir.1973)). If an implied-in-fact contract existed between the parties, then Article 180 would not apply.

The district court, however, ultimately found that only a quasi-contractual relationship existed. There is no bright line between a quasi-contract and an implied-in-fact contract; for either to arise, it is necessary that the benefit not be conferred gratuitously and that compensation not be within the discretion of the party receiving the benefit. While generally a *quantum meruit* claim will not lie to recover payment for services within the ambit of an express agreement covering those services, *see, e.g., Goodman v. Motor Products Corp.*, 22 Ill.App.2d 378, 161 N.E.2d 31, 34 (1959); *O'Keeffe v. Bry*, 456 F.Supp. 822, 831 (S.D.N.Y.1978), "[a] quantum meruit action is appropriate to recover the value of services performed and accepted on the basis of a contract for those services which left unspecified what the compensation would be." *Belmont Industries, Inc. v. Bechtel Corp.*, 425 F.Supp. 524, 527 (E.D. Pa.1976). *See Moreen v. Carlson's Estate*, 365 Ill. 482, 6 N.E.2d 871, 876 (1937); *Dorocke v. Farrington*, 43 Ill.App.2d 394, 193 N.E.2d 593, 595 (1963).

Here, while Overseas and Farouki agreed that when they worked together they would both participate in fees and commissions earned, "they did not agree what percentage of each commission or fee each of them would receive." *Overseas III*, Finding of Fact No. 86. "Turkkan and Farouki never had a specific agreement as to the amount to which Farouki would be entitled." *Overseas III*, Finding of Fact No. 92. In addition, there was no course of dealing between the parties or industry custom sufficient under Kuwait law to supply the missing percentage. *Overseas III*, Conclusion of Law No. 22.

Article 3 of the Commercial Law No. 2 provides that if a contract is "silent on a matter," then "the legal provisions contained in this Law ... shall apply to all matters covered by the said provisions either to the letter or context." The district court correctly found that Article 180 is the legal provision which applies. Thus, even if a contractual relationship existed between the parties, the district court properly relegated Farouki to *quantum meruit* to recover for his contributions, for his compensation was unspecified. The district court then found that "Farouki's loss suffered under Article 180 is deemed to be 50% of the market value of the aggregate

services rendered to Sangamo." *Overseas III*, Conclusion of Law No. 25.

## IX.

██ Farouki, through Universal, raises a fusillade of contentions under both Kuwaiti and Illinois law regarding his relationship with Overseas and with Sangamo, but when stripped they all reveal the same underlying grievance: that the district court improperly deducted Overseas' attorney's fees and collection costs from the gross commission to be divided between them.

We reject Farouki's contention. Treating the gross commission as a common fund and then reimbursing Overseas for its attorney's fees and collection costs from the gross commission falls within the "historic equity jurisdiction of the federal courts." *Sprague, supra*, 307 U.S. at 164, 59 S.Ct. at 779. Sitting as a Kuwaiti chancellor in equity, the district judge had the same inherent authority to reimburse Overseas for its efforts which directly benefited the "class" of Finders in collecting (as opposed to generating) the gross commission. Article 180 is designed to prevent unjust enrichment, and the common-fund doctrine "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." *Boeing, supra*, 444 U.S. at 478, 100 S.Ct. at 749.

That the district court wisely exercised its equitable authority is highlighted if we *accept* Farouki's assertion that he and Overseas were partners in a joint venture to win the Kuwait Motorway Project for Sangamo. This is Farouki's preferred interpretation of his relationship with Overseas, to which he adds that the rights and duties of the parties to that joint venture should be governed by Illinois law.

Under Illinois law, "a joint venture is an association of two or more persons to carry out a single enterprise for profit, and the rights and liabilities of its members are tested by the same legal principles which govern partnerships." *Smith v. Metropolitan Sanitary Dist. of Greater Chicago*,

77 Ill.2d 313, 33 Ill.Dec. 135, 138, 396 N.E.2d 524, 527 (1979) (citation omitted). Section 18 of the Uniform Partnership Act in turn provides as follows:

> § 18. The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules:
>
> * * * * * *
>
> (b) The partnership must indemnify every partner in respect of payments made and personal liabilities reasonably incurred by him in the ordinary and proper conduct of its business, or for the preservation of its business or property.

Ill.Ann.Stat. ch. 106½, para. 18 (Smith–Hurd 1987). So even if we (and the district court) saw the facts exactly as Farouki does, and Farouki could recover directly from Sangamo the gross commission as a partnership asset, he would still be liable for one-half the total expenses, including attorney's fees, attributable to the joint venture's efforts to collect a commission from Sangamo. (In contrast, Farouki and Turkkan *expressly* agreed that each would be responsible for his own expenses in generating (as opposed to collecting) the commission. *Overseas III*, Finding of Fact 90(c).)

If an implied-in-fact contract (even if not for a joint venture) existed, and an even split of the commission is derived from the parties' conduct and how they divided their responsibilities, then it is implausible—and violates the Uniform Partnership Act's presumption—that the commission to be split is anything but the net commission. What Overseas will actually receive is its net commission. "It is plain ... that profits are not equal to revenues. Indeed, we would have thought that no citation was necessary for the proposition.... Perhaps the first rule of accounting is that the black ink of profit is not entered into the ledger until expenses are deducted from gross revenues." *Pashman v. Chemtex, Inc.*, 825 F.2d 629, 631 (2d Cir.1987).

We know by analogy that where there is an agreement between real estate brokers

to share commissions, the majority rule is that the principal must pay the commission before one broker becomes liable to share the commission with another. Annotation, *Construction of Agreement Between Real–Estate Agents to Share Commissions*, 71 A.L.R.3d 586, 606–10 (1976). We do not know when a cause of action on an agreement to share business introduction commissions accrues in Kuwait. But "it seems unsound to require a broker in any industry to share a commission it does not ultimately receive." *Sven Salen AB v. Jacq. Pierot, Jr., & Sons, Inc.*, 559 F.Supp. 503, 506 (S.D.N.Y.1983), *aff'd mem.*, 738 F.2d 419 (2d Cir.1984). We therefore agree with *Sven Salen AB* that borrowing from the real estate industry "at least establishes a presumption in favor of not requiring ... brokers to share with their cobrokers commissions they may never receive." *Id.*

The district court did not see the facts as Farouki does, and instead relegated him to *quantum meruit*, but that difference had no effect on how to distribute the commission between Overseas and Farouki. If *quantum meruit* is the mode of recovery, then to reflect accurately the benefit Farouki conferred upon Overseas the amount of reasonable attorney's fees and collection costs expended by Overseas in collecting the commission should be deducted from the $472,500 to be received by Overseas from Sangamo.

Farouki's *quantum meruit* claim also does not accrue until Overseas receives its commission from Sangamo because until then Overseas is not enriched by Farouki's actions. *Cf. Sven Salen AB, supra*, 559 F.Supp. at 506 (S.D.N.Y.1983). Before Sangamo cuts its check, Overseas has received no benefit from Farouki's actions, but has been harmed by the attorney's fees and collection costs it has incurred. What Overseas will receive from Sangamo is only its net commission; that part of Sangamo's commission check equaling Overseas' attorney's fees and collection costs erases a deficit in Overseas' books, but does not create a new benefit.

Under any scenario, Universal's reasonable attorney's fees and collection costs—

not just Overseas'—should be considered as a debit to the Finders' common litigation fund to recover the commission. It too is an expense to be borne equally by both parties. It appears that Universal played a significant role in prosecuting the Finders' claim against Sangamo. For example, Universal's counsel ordered and took Reyhan's deposition. In determining how much is to be deducted from the gross commission before it is split, the district court should deduct Universal's reasonable attorney's fees and collection costs as well.

## X.

 Finally, Universal claims that Overseas did not enter into a written commission agreement with Sangamo so as to avoid confronting Sangamo. At the time, Universal says, Overseas wanted to curry favor with Sangamo for future representation opportunities. Overseas' failure to obtain a written agreement, Universal claims, breached some fiduciary duty to Farouki. The parties agree that under Kuwaiti law Overseas did not breach any duty if it attempted in good faith to reach a binding agreement.

Farouki appears to have waived any breach by conferring discretionary authority upon Turkkan on whether and how to negotiate. "Turkkan had the authority to negotiate with Sangamo on the matter of the commission to be paid to [Overseas] if Turkkan believed such negotiations were necessary." *Overseas III*, Finding of Fact No. 90(d). In addition, there is no indication in the record that Farouki did not know about the (lack of) progress in the negotiations. To the contrary, Farouki himself negotiated with Reyhan about the commission.

In any event, and more important, we have already determined that the *market value* of the Finders' services equaled ¾ of 1 percent of the project amount. Thus, assuming there had been vigorous arm's-length negotiations between Overseas and Sangamo, and an arm's length market value agreement had been reached, then the Finders would be in exactly the same posi-

tion as they are now. Farouki has not been damaged by any breach.

## XI.

In sum, we reverse the district court's denial of Universal's claim against Overseas for its reasonable attorney's fees and collection costs incurred in collecting the gross commission from Sangamo and remand for the district court to determine that amount. See 7C C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure, supra,* § 1841 (1986). Like Overseas, Universal is entitled to recover from the common fund (the gross commission) all reasonable expenditures that were instrumental in securing the gross commission for the Finders from Sangamo. These costs do not include those expended between Overseas and Universal fighting each other, in particular the amounts Overseas spent defending against Universal's claim as an intervenor against Overseas.

The district court's judgment is otherwise affirmed.

AFFIRMED IN PART AND REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.